Smith *v.* Smith.

ALICIA A. SMITH, appellant,

*v.*

RICHARD SMITH, respondent.

1. The words "extreme cruelty," in our act concerning divorces, are not stronger in meaning than the term *sævitia*, derived from the civil law.

2. A charge of incest made by a husband against his wife, persisted in, without cause, attended with slight acts of violence, jealous watchings, suspicious conduct and reasonable apprehension of bodily harm, is good ground for judicial separation by a divorce from bed and board.

3. It is not a good defence to such complaint that the husband appears to be under an insane delusion, where there is not general insanity or *dementia*.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions:

This bill prays for a divorce from bed and board, and alimony during the natural life of complainant or the continuance of said divorce. These prayers are founded on the allegation of extreme cruelty. A great many acts of the husband are set forth as extremely cruel. I will present the principal ones.

The parties were married November 7th, 1854. Shortly after their marriage Mrs. Smith went to make a call. Before going she told Mr. Smith that she would return by six o'clock. She returned about fifteen minutes after six. She says for this he accused her of falsehood, and continued to so accuse her for a long time. He says that she denied having promised to return at six, and that it was for that denial that he accused her of untruthfulness.

Again, in the year 1865, Mrs. Smith went to Paterson on a visit, and said she would return at a time named, but did not. For this he also accused her of falsehood.

Mr. Smith is charged with taking from his wife a music-box. It appears, however, that there was a church festival, in which they were both interested. Mr. Smith asked her consent, and obtained it, to devote the box in question to the uses of the festival, and it was so applied.

Mr. Smith is charged with cruelty in sending their son—their only son—to Hartland, Vermont, to school, at an early age. But, I think, from the evidence, Mrs. Smith did not so regard this at the time. The son, during another period, attended school at Summit. He came home on Friday night to spend Saturday and Sunday. During the first evening, by permission of his mother, he was making molasses candy. For this his father sent him back to school the next day.

Mrs. Smith says that in 1865 a change came over Mr. Smith's deportment. He became cold and morose. About this time he became acquainted with Mrs. Skinner, of New York city. It is urged that he gave this woman too much attention; that he went shopping with her; that he corresponded with her; that he had her photograph, and left it and a letter from her under the cover of an etagere in his own house, where Mrs. Smith found them; that he allowed her to come to his place of business; that he invited her to his house, and showed her through it; that he visited Saratoga at the same time she did, and kept up his acquaintance with her there, and that he had business troubles with her. These things transpired in the year 1865, and soon afterwards. Of all of them, however unpleasant or unjustifiable, Mr. Smith told his wife. There does not seem to have been anything done clandestinely, nor is there the slightest charge or intimation that Mr. Smith was guilty of adultery.

In 1876 Mr. Smith discontinued business relations with his son. Years before, he had taken the son into his employ as an apprentice, and afterwards he admitted him as a partner. The fact that the father saw fit to sever this relation, is set forth, among other things, as an act of cruelty to the wife.

Not a little has been said respecting his refusal· to surrender to Mrs. Smith jewels which she insists he gave her.

These things I have alluded to for the purpose of saying that I think they should not have been thrown into the case. To my mind, their introduction is without any profit. I cannot discover that they subserve the cause of truth or justice in the slightest degree.

The rest of the story is both painful and unfortunate. I shrink from its contemplation, however free from difficulty the path to a judicial determination may be.

During the holidays of 1878 and 1879, these parties seemed to be as happy as the happiest of their fellows. I understand Mrs. Smith so to testify. But soon·thereafter misfortunes to the household came.

On Saturday, January 11th, 1879, Mr. Smith told Mrs. Smith that he was going to New York, to be absent until after Tuesday, the day on which directors of a bank in which he was a stockholder were to be elected. He told her he would send for her, and that they would spend the Sabbath together. He left home about eight o'clock. He did not send for Mrs. Smith. About four o'clock P. M., she got a telegram from him in these words :

"January 11th, '79. To Mrs. Richard Smith, 49 Halsey street—Take the morning train and meet me in the presence of the one that was so startled when I blew that blast; 2778."

It was unsigned. Mrs. Smith says that he told her afterwards that he sent this telegram to mislead her. The next day the son received a telegram from Mr. Smith, dated Boston, January 12th, 1879, inquiring :

"How is the game of chess progressing? Please move No. 3 immediately, as I believe that is the right move to make; 2778."

It was not signed. These figures, 2778, were on his private post-office box in New York. On January 13th, telegrams came to the effect that Mr. Smith had jumped from a second-story window to the sidewalk, and that he ran to the wharf and jumped into

the bay, and that he was rescued by the police and placed in the city hospital. Mrs. Smith and her son left Monday afternoon for Boston and reached there early Tuesday morning. Before going to Boston the whole truth had not been disclosed to Mrs. Smith. When they met at the hospital, he said, " How did you come to find me? I did not think you would find me." She said, " Oh, Richard, I would go to the end of the world to find you." Mrs. Smith was told that Mr. Smith gave his name in Boston as Charles Williamson. She says that he told her that he had wandered through Boston until he came to the City Hotel, where he engaged rooms for the night, and that he then inquired for the madam, who brought one of the girls, who sat on his lap, and that there was something connected with that which she would never know. He also told her that he jumped from his window, and into the water. She found him in bed and was obliged to get help to keep him in bed. He insisted that the son should return home and that his wife should remain in Boston with him. He said that he had lost all his money and wanted some money and a revolver. They started home Tuesday, 14th, in the evening. After they got into the carriage he told his son that he would rue the day that he dared to take him home. At the depot he clung to the stove, thus resisting being put on the car. Mrs. Smith says, " He was very angry at me and my son, and he said he would never live with me again, and that I might go with my friends." On the way home, she says " He was very coarse, indignant, at my son and myself; " and that he said, " You may think I'll forget this, but I never will." While waiting for a carriage at Newark, she says, " He struck my son a very hard blow between the eyes with his fist," and " that he walked home with his boot partly off." This is the end of this part of the story on direct examination.

From the cross-examination it appears that when they reached home Mr. Smith was put to bed, and Mrs. Smith prepared him something to eat. A doctor was called. Mr. Smith remained in bed an hour or two. The doctor gave him a bath and attended to him. In a short time Mr. Smith was down in the sitting-room, and the doctor came in and said he must go to the

Smith v. Smith.

asylum. Mrs. Smith says she opposed this, and begged to have any number of nurses and take care of him herself, but they (the doctor and her friends) would not consent to that. She also says that she went along to the asylum and desired to remain there, but the rules forbade that. Then this follows:

" Q. Did you agree with the doctor in the opinion that he was not in his right mind?

" A. I did not have any opinion at all; I felt incompetent to decide.

" Q. Do you mean to say that with all you observed of him, and with all the advice of the physicians, that you had no opinion in your own mind on that subject?

" A. I thought he was under great excitement, and I gave up to what the doctor and my friends decided, feeling that they understood it and had experience in it, and I had not, and consequently I deferred to them.

" Q. To what did you attribute his great excitement?

" A. Well, I thought his mind had been exercised about the bank, but I could not tell."

It appears that Mr. Smith made no opposition to going to the asylum. He was there ten days. Mrs. Smith then went for him. She thought he was somewhat improved, but says that " he was still under excitement." He was anxious to get home. Mrs. Smith would read to him and walk with him. He did not go about his business at once, she says, because he was not feeling very well, and was " hardly restored to a sound mental condition." I understand Mrs. Smith to say that her husband remained in about the same condition, and that she continued to pay about the same attention to him until April 12th, 1879. I will here copy two letters which, I think, afford a key to the future, partially at least, if not altogether;

"JANUARY 19th, 1879.
" H. A. Buttolph, M. D.:
" DEAR SIR—Believing myself in usual health, I have the honor of requesting your permission to depart at an early hour, as my business reputation as well as my business interests will materially suffer by my longer detention. With the highest respect, I am yours very truly,
"RICHARD SMITH."

" MY DEAR ALLIE—I beg to know, at the earliest moment, at what time you are expecting me to return. If it is likely you will, and that it is your

Smith v. Smith.

intention to cause all my plans for 'spring business' to be frustrated and brought to naught.

"You cannot fail to remember what a condition it was in soon after our return from Europe and what a persevering effort it has required on my part to bring it through.

"Should it commence to fall off soon, from any cause, and continue to do so until the expiration of the lease, I have great fears for the consequences.

"I assure you the importance of the above cannot be overestimated at the present time. It must ever affect our happiness as well as that of Kendall.

"I beg you will take measures to bring us together immediately. With much love to yourself and Kendall,

"RICHARD SMITH."

His allusions to his "business reputation" and "business interests," and to the possible intention of his wife "to cause all his plans for spring business to be frustrated and brought to naught," should be borne in mind in this discussion.

But, to proceed with the orderly narration of events after his return from the asylum. On April 12th, 1879, his sister, Mrs. Powers, and daughter, visited him from Rock Island, Illinois. Mrs. Smith says:

"When they came then he turned right against me; he had received all my attentions previous to that, and when they came they took the entire possession of him."

The daughter's name was Sarah J. Mrs. Smith says that her husband's time was mostly devoted to her; that he spent most of his time in her room, and was "unkind and uncivil to me and to my son." She continued:

"On the 14th of April I was taken ill with palpitation and pains about my heart, and told Mr. Smith of my illness, and I was so distressed that I was unable to remain in bed; and I said to him I would go down to our sitting-room, and when I felt better I would return; he said if I left the room he would lock me out, and, as I left, he locked the door and obliged me to remain out in my sick condition all night."

A day or two after this she says that he ordered her to leave his room and go up stairs. On the 17th of the same month he ordered her to go to Paterson, telling her that it was for their

mutual happiness that she should go ; when she told him that
she could not go there very well, as she was dressmaking, at
which he ordered her to leave the room and go to work. Mrs.
Smith had family relatives living in Paterson. She went to
Paterson in a few days and remained six weeks. She wrote let-
ters to Mr. Smith but got nothing in return, except to one in
which she made a request for some money, to which he sent an
envelope directed to her, containing a piece of blank paper and a
one-dollar bank note, until about June 10th, when he wrote her
asking her to come home to go with him to Saratoga.

During the stay of Mrs. Smith at Paterson, Mr. Smith and his
niece, Sarah J. Powers, went to Saratoga together. They went
June 2d. Mrs. Smith says her husband told her that he and Miss
Powers occupied the same state-room, at night, on the river
steamer, and that they occupied adjoining communicating rooms
at the hotel at Saratoga. Mrs. Smith says that from April 16th,
when her husband ordered her to go up stairs to sleep, she slept
in a separate room from him every night, with only one excep-
tion, until July 16th. About the 1st of July he asked her to
go to Saratoga and she declined to go, but says that he went and
procured the tickets and obliged her to go with him. In a few
days they returned to Newark, he, however, requesting her to
remain at Saratoga, which she was unwilling to do.

Soon after the events last noted, Mr. Smith went to Sharon
Springs, remaining there about two weeks, when he again went
to Saratoga, at which place Mrs. Smith joined him, where they
continued about two weeks. But, while he was at Sharon
Springs, Mrs. Smith says that he wrote three letters to Miss
Powers before he wrote to her, and then that he wrote her a line
only, on a postal card. This last visit to Saratoga was of about
two weeks' duration. Mrs. Smith came home and Mr. Smith
went to Dr. Hamilton's Medical Institute there, at which place
he continued until December of the year 1879, with the exception
of a single visit to his home. During this last-named visit at
Saratoga, he had Mrs. Powers and her daughter with him.
Mrs. Smith says that she learned this both from him and them.
From Saratoga he went to Clifton Springs; was there about

four months; thence to Buffalo, was there about two weeks, and reached home about April 1st, 1880.

On November 3d, 1879, Mr. Smith wrote his wife. In this letter he asks her to keep account for what she spends the money he advances to her, and to repay out of her own estate any which she has spent of his for traveling expenses and for church bene-- factions.

After his return from Buffalo, in April, 1880, Mrs. Smith, asked her husband for a few dollars to buy some clothes with, but he refused her, and went to his trunk and got some letters which she had written him, and rushed out of the house, saying that he had been to his lawyer, and that she was spending too, much money.

From May 5th until July 1st, 1880, Mr. Smith was in, Europe. On July 10th they both went to Long Branch, and stayed six days. While there, Mrs. Smith says:

"He seemed very nervous and restless, and I would find him walking in, my room in the middle of the night; and I think it was the first night I was there, I found him leaning over me looking peculiar—bending over my bed; and so he continued to walk back and forth several nights; his appearance was very alarming."

She says that she was very much alarmed.

For some months prior to the last trip to Europe, Kendall, the son, had been in partnership with his father, and had been boarding from home. Mrs. Smith says that before her husband sailed, he invited Kendall home to board, apparently having given up his dislike for him. The son came home, and remained there until August 27th, 1880, about four months.

About July 16th, 1880, Mr. Smith asked Mrs. Smith to sleep, with him again; she did so, and continued to sleep with him until the 27th of August. She says:

"I slept very little; I was kept in a state of alarm and anxiety all the time by watching and caring for Mr. Smith."

She was asked to state anything that occurred to cause alarm. She said:

Smith v. Smith.

" On, I think it was, the 18th—I am not sure, of July—about two o'clock in the morning, he got up and dressed, and went out about a block from the house, he said, for the purpose of getting a drink of water ; he returned, undressed and went to bed; immediately after retiring to bed, he rose partly up, held me firmly, taking me by the shoulders, and, with a very excited look, said, 'How long has this been going on?' I said, 'Richard, I don't know what you mean;' he said, 'Yes, you do, and forgive you I cannot, if for life or death'; he said, 'When I wrote you that letter, I said things look just like midnight darkness; I tell you,' he said 'I never will be well while Kendall remains at home; he must go to California, and you must tell him to do so;' I was greatly alarmed and went to the door and called our son; Mr. Smith followed me to the head of the stairs; I called to him, and he came down, and I said to him, 'Kendall, your father says you must go to California;' and he said, 'Kendall, will you go?' and he said, 'Yes, sir;' and he opened the door and ordered him up stairs immediately; Kendall left and went up stairs; for a little while Mr. Smith was quieter, and then he sprang up and went up to my son's room and bolted himself in, and he took hold of my son's hand; * * * I heard him lock the door; * * * he was gone only a few minutes, when he returned to our room; * * * he told me what he had said; * * * he said the night Kendall came to Monmouth Beach—it was the 8th of July—that Kendall came to my room and locked the door, and he said, 'there must be wrong-doing—improper relations—or the door would never be locked;' I tried to reason with him and remove his unfounded suspicions, but I utterly failed; I told him that I was very glad that I could recall the circumstances ; and I told him that we had received a letter from our sister-in-law—Mr. Smith's sister-in-law—it was a family letter, and we had read it, and a portion of it was addressed to Kendall; * * * I told him Kendall had not had an opportunity of reading it—and I wanted him to read it that night—and he was at the bureau reading the letter; at the extreme end of the hall, the windows were up, and there was a circulation of air which made the door swing backwards and forwards; at first I closed the door, but the catch was out of order, and it would not remain closed, and then I locked it—only in consideration of Mr. Smith—for I was anxious to keep him asleep, and supposed he had retired; but he was watching outside the door."

Mrs. Smith says that she explained all this to him, and he said, " he didn't believe what I had said." She says she has never known of any other cause for his suspicions. The next morning, after breakfast, Mr. Smith told Kendall that he must settle his accounts in the store, and make preparations for going to California. On that same day (July 19th) Mrs. May, a sister of Mrs. Smith, and her son, were at Mr. Smith's. They came

Smith *v.* Smith.

.about nine A. M., and stayed till after tea. Mrs. Smith continues:

"At the dinner-table that day, Mr. Smith was very much excited, and looking hurriedly from myself to my son, commanded Kendall to stop looking at his mother—they were lover's glances, and he would not have it; he .continued it so all the time we were at the table;    *    *    *    after dinner, as my son and Mr. Frank May were leaving the house, Mr. Smith and myself attempted in leaving the dining-room to accompany them to the door; .before reaching the door, Mr. Smith took me by the shoulders and forcibly .pushed me in the sitting-room, and said he would have none of this; I asked him what he meant; he said I was looking out of the window at Kendall, while the fact was, I was on the opposite side of the room, where I could not .see out of the window at all;    *    *    -*    he asked Mrs. May what she .thought of a wife and son lying to him; she asked what the trouble was, and .he said we had promised that Kendall should go to California, and that now .Kendall would not go, and that I upheld him."

Mrs. Smith says that Mr. Smith's manner and language were the same at the tea-table, and that he asked Mrs. May what she thought of a wife and son being locked up in a room together, .and that Mrs. May said she thought it perfectly right; when he .said he was surprised that she should consider there was no wrong-doing and improper relations when a son was locked up .in his mother's room.

The next circumstance of note occurred August 4th. Mrs. .Smith says:

"Mr. Smith left the house for a short time, and he had never done so before .since he had commenced this dreadful state of feeling; I spoke to my son— .he was on the third floor, and I was on the second, and at the foot of the stairs —I asked him a question, and Mr. Smith came in and heard me speaking to .him;    *    *    *    Mr. Smith came up with a bound; it seemed as if he never stepped on the floor below until he was up above, and with both his open hands he struck me so forcibly right upon my shoulders that I was lame for several days, and it prostrated me on my bed; he said, 'How dare you speak to Kendall?' it made me sore and lame for several days; then he took hold of me; I cried out with alarm so loudly that I brought my son from the third story; I was very much frightened, and tried to get out of my room; he took me by the shoulders forcibly and pushed me back."

The son came and told his father that he would not allow him

Smith *v.* Smith.

to strike his mother, when Mr. Smith said that she was his wife, when the son said :

"She may be your wife, but she is my mother, and I will defend her, and I will not allow you to strike her."

Mrs. Smith went to the sitting-room and Mr. Smith followed.. She says :

"He forcibly threw me on his lap; * * * he wanted me to say that he did not strike me; I said 'Richard, you did strike me, and I shall for-- ever say you struck me,' and that was about the amount of it."

She continues :

"He watched me persistently, from morning till night; he never allowed, me to go into the street; he never allowed me to leave my room; he would stand with his hand on the door-knob as I was finishing my toilet in the morn- ing, and wait until I passed out of the door; * * * once I went out to a store and was gone a few minutes, and in a very excited manner he wanted to know where I had been; I told him, and he wanted to know what I had been. doing, and I enumerated the articles, and asked him if he was not ashamed of himself to treat me so ?"

She would take walks with him mornings and evenings when he wished; played cards and other games of all kinds with him. She says :

"I read and gave up my whole time to him, from the time he commenced acting in this way; at this time and afterwards, he would get up every night. at two o'clock, and go out on the street for a drink of water."

Another date to be remembered is August 27th.    Mrs. Smith. says :

"I was reading with and to Mr. Smith; a part of the time I would read and' he would read part of the time, and I think we played games, and I am not certain if we took a walk, but I usually took a walk with him every day; and my son came in to dinner and remarked that he had met a friend on the cars with her daughter-in law; then Mr. Smith rose up and said to Kendall, 'You shall leave this house and find another stopping-place;' I told him I could not. remain without the protection of my son, and asked him to reconsider, but he. was immovable and utterly refused to do so."

Mrs. Smith left that day and went to her sister's at Paterson. I have given all that passed. When asked why she left, she said :

"Because I was afraid of bodily harm—yes, of my life; with these dreadful suspicions and his persistent watching, I would not have dared to have stayed with him without protection; * * * I was worn out and weary, and felt that I could not endure the strain much longer if I was compelled to watch over him and care for him as I had done."

Mr. Smith kept a revolver in his room, and had for a long time. She says that she had fears of bodily harm from July 18th and before, until the 27th of August. Mr. Smith says that Kendall urged her to leave, saying, " Come, mother, come."

There is not a word to show that he intimated that Mrs. Smith should leave, or that he desired her to leave.

Mrs. Smith left August 27th, 1880. Kendall left with his mother. They both went to Paterson, to her sister's.

On August 30th, 1880, Mrs. Smith and her sister, Mrs. May, returned to the residence of Mrs. Smith's husband. They reached there early in the forenoon and found Mr. Smith at home. She was asked what her object was in returning, and said :

" My object was anxiety in regard to Mr. Smith, and my great desire, if possible, to have an arrangement made for my own protection, so that I could remain in my home, but he utterly refused that I should have any one there; in the presence of my sister he told me that I should not have any one there, nor my servant."

I think it can only be claimed that he referred to the servant named by Mrs. Smith, one who had formerly been in their employ, and who left the day that Mrs. Smith left.

Mrs. Smith says that Mr. Smith refused to have the son back, and that he said :

"If I returned we should occupy separate rooms; * * * his manner was very bitter; he said he would not have any one there but myself, and would not have any one else; * * * I felt that I could not return or remain there at all."

Mrs. May says that Mr. Smith received them very pleasantly. She says:

37

Smith *v*. Smith.

"We went into the sitting-room and asked him where Ann (the servant) was, and he told her that Ann was not there at all; * * * she expected to find Ann there; she had promised to return that day and wash, and she expected to find her there; * * * he said she was not there, but that she had been there that morning, and he did not care to have her back—he would not have her back; and Mrs. Smith said she had thought she would come home again, if he would allow Ann to be there, but she must have a servant there, or some one for protection, and he refused it, and said she could not have Ann there; and he said that Ann was not a good girl, or she would not have left because Kendall left."

Mr. Smith says that on August 27th, before she left, his wife said that she was going on a visit. This, I think, is not denied. He says that Mrs. Smith expressed no fears of personal safety. I may observe that this seems to me to be quite important. And, in speaking with reference to the events of August 30th, he says that Mrs. Smith expressed no fears of personal violence from him, in case she came back.

Mrs. Smith and her sister remained with Mr. Smith until time for dinner, when Mrs. Smith asked him for money to get dinner for her and Mrs. May, and he refused. Mrs. Smith and her sister then left.

And that was the first and last effort at reconciliation, if the transaction deserves the name, applying the observation to both.

The next meeting was prompted by a desire for money and clothing. That meeting was in November. 1880. No communications whatever had been had. Mrs. Smith was in Paterson and Mr. Smith was in Newark. It seemed that nothing could excite either to open correspondence in the meantime. But in November, Mrs. Smith, Mrs. May and their brother, a minister of the gospel, called on Mr. Smith at his home in Newark.

Let us take Mrs. Smith's narration of the interchange of words. She says:

"I told him that I needed some clothing, and had come for it; and after I got my clothing, I said, 'Richard, when I left I only had $2, and I need some money; I have not any more;' and he said he would not give it to me; I asked him two or three times, and finally I had got a hack to take my trunk to the depot, and I said, 'Will you give me money to pay for that?' and he said, 'I will not.'"

Then this question—

"*Q.* Did you receive from him any proposition, directly or indirectly, to
return to your home?

"*A.* I did not.

"*Q.* Any offer of any proposition for your safety there?

"*A.* I did not."

Nor did she make any offer or proposition, or say one word
to solicit an offer or proposition from her husband. Was he
heroically stolid? so was she.

I have given all the principal facts which must govern in
deciding this case. I have selected them chiefly from the state-
ments of the complainant. The question is not simply, Was
Mrs. Smith justified in leaving the residence of her husband
August 27th, 1880? but is also, Was she justified in filing this
bill, under all the circumstances of the case, without first doing
more than appears to have been done? The case is, by no
means, an ordinary one. It appeals to the most faithful consid-
eration of the court, because it cannot be said that the path which
leads to the right conclusion is well defined. I desire to add
that in every such case grave responsibilities rest upon the wife.

The law that I shall follow has been clearly and wisely laid
down by the chancellor. *Smith* v. *Smith, 6 Stew. Eq. 458.* The
very elaborate effort of counsel does not in the least impugn the
integrity of that opinion. With great deference, I must say
that the argument of counsel seems to me to be aimed at a
proposition not in the case, as discussed by the chancellor. In
speaking of the rights of the wife, he says: "Nor is she re-
quired, by the obligations of her matrimonial duty, to abide with
him when his cruel treatment of her through malevolence,
whether the result of insanity or not, renders it dangerous to her
life or health to continue to live under the same roof with him."
And again, "It is not out of place to say that it seems to be
clear that a wife is equally entitled to protection under our di-
vorce law against extreme cruelty on the part of her husband
where his malevolence is the result of insane delusion or where
it springs from jealousy or hate." It seems to me that there is
nothing doubtful in this exposition of the law.

Is the case, as made by the complainant, within it? I must

settle this point by what took place within a few days, viz., the 18th or 19th of July and August 4th, 1880; on the former was the first act of violence, and on the latter the only other complained of. Mr. Smith went to Boston in a crazy fit in January, 1879. Mrs. Smith and Kendall brought him home. He then told Kendall that he would rue the day. When they reached Newark he struck Kendall. The next day after they reached Newark they took him to an insane asylum. This he felt most keenly, as his letter from that place makes most clear. It affected him personally. It affected him in his business. This was his view of it, as the letter shows. It is most evident that his feelings became highly wrought up against Kendall. I cannot see that it matters whether wisely or not, I do not stop to inquire, because I am satisfied that Mr. Smith was, during the period of which I must speak, afflicted with a mental disorder which rendered him quite irresponsible for certain things which he said and did. While in this condition he discovered Mrs. Smith in Kendall's room at night, with the door locked. This circumstance was the foundation of a criminal charge against her. In the early part of July, 1880, they were all at Long Branch. Mrs. Smith had a letter from a relative of Mr. Smith's and took it to Kendall's room to read it to him. The wind blew the door of his room to and fro so much that Mrs. Smith locked it, the catch being broken. In a day or two they all returned to their home. During the second night of their return, and about two o'clock, Mr. Smith arose, dressed himself, went to a pump on the street for water, returned to his room, went to bed again. Immediately after retiring to bed he rose partly up, took Mrs. Smith by the shoulders and held her firmly, and, with a very excited look, said, "How long has this been going on?" All the rest has been given above. He then wanted Kendall to go to California, and Kendall promised to go but went not.

I think the circumstance just referred to took place August 18th, or early the next morning. It seems certain that during the day following the event, Mrs. May and her son visited Mrs. Smith, and were there at dinner and tea. Mr. and Mrs. Smith, Kendall and Mrs. May and her son were at dinner, and then it

·was that Mr. Smith told Kendall to stop looking at his mother, :and said "they were lover's glances." After dinner, Kendall .and his cousin were about leaving the house. Mrs. May, Mrs. Smith and Mr. Smith were following them to the door, when Mr. Smith seized Mrs. Smith and thrust or forced her into and across the sitting-room and accused her of looking out of the window at Kendall.

This, I think, is the first act of violence complained of. At this time they were occupying the same bed. They continued, after this event, to occupy the same bed until August 4th. On that day Mr. Smith left the house on an errand, and, as he was returning or after he returned, he saw that Mrs. Smith had gone .to Kendall's room during his absence. He hastened to her bed-room, caught her by her shoulders and threw her on their bed, .saying, "How dare you speak to Kendall?" This was the .transaction which was followed almost immediately by his taking .hold of her and forcing her on his lap and kissing her.

From this date, August 4th, until the 27th they occupied the .same bed. Between these periods nothing of note took place. True it is, there was many a circumstance to make Mrs. Smith .anxious for Mr. Smith. There are but few wives who have not, .at some period of their married life, had burdens equally as sore. The law provides not for them. During the forenoon of the 27th ·of August, Mrs. Smith and her husband were engaged in read-.ing to each other, in walking together and in playing games. At .noon Kendall came in and made a remark about a young lady whom he had met, when his father said, "You shall leave this .house and find another stopping place." Mrs. Smith said to him that she could not remain without the protection of her son. Kendall left and so did Mrs. Smith. They went together to Paterson. They left in the evening.

As appears, there were two acts of violence; how severe or ·cruel we need not attempt to measure. But were they of such a ·character, under the circumstances, as to awaken a reasonable .apprehension of bodily harm? When this point is reached the ·court will interfere. Not alone the particular act or acts is or

are considered, but all the circumstances. The aim of the court. is to protect the wife, not to punish the husband.

Let us look at the principal circumstances attending and following these two acts of violence, and abide by the judgment which they unerringly lead to. For some time prior to the Long Branch visit, Mrs. Smith had not occupied the same bed with her husband. After this she did. Within two days after they returned from Long Branch he accused her of this horrid crime. And within twenty-four hours this charge was followed by his thrusting her from the hall into the sitting-room, for, as he said, looking at Kendall through the window. This was the first act of violence. It was committed in the presence of Mrs. May, her son and Kendall. It was on account of Kendall that the violence was used. Kendall was the exciting cause.

What followed? Nothing whatever to awaken special attention, except, at the supper table, Mr. Smith accused Kendall again, as he had at dinner, of casting lover's glances at his mother. Mrs. Smith did not leave her home to seek protection. She made no complaints. She occupied the same bed with Mr. Smith the night following, and from thence onward until August 4th. They spent a great deal of time alone with each other. They conversed, they read, they took walks and they played at games. In this manner about two weeks pass.

Then comes the scene of August 4th. And the alleged act. of violence of that day is not complained of. Mrs. Smith did. not leave her home. She sought no protection. The night following she occupied the same bed with her husband, and continued so to do until the curtain dropped on the 27th. During each. succeeding day there was no less attention to each other than. before. The servant girl was never called in to stand guard. Kendall was never asked to stay within call. Twenty-three days pass, and Mr. and Mrs. Smith are together by themselves almost all the time, but Kendall is away at his place of business.. Twenty-three nights pass, and Kendall sleeps in his own bed, a. story above his mother, as he had always done before.

Was there, then, in these things, any reasonable apprehension, that bodily harm would thereafter be inflicted on Mrs. Smith?

Did she think so?    Did she do anything whatever that can now
be relied upon as evidence that she was apprehensive of serious
violence to her own person?    At such times the conduct is the
best interpreter.    The actions are the unfailing index to the
emotions or sensibilities.    When Mrs. Smith found her husband
in a frenzied mood at Boston, she employed a hospital nurse to
accompany them to Newark, and, when she reached home, she
immediately called a physician, and carried her husband to the
asylum.    She speaks of keeping her trials in her own bosom.
That had become impossible, to the extent that Mr. Smith's
violence was concerned on account of and against Kendall, for
Mr. Smith had already been confined in an asylum for several
days on account of mental aberration, and I do not think that
there can be the slightest pretence that he was not laboring under
the same defect when he made his unfounded charges against his
wife and son.    Then she called in others for consultation and
aid.    But now, before she left her home and her husband alone,
she consults no friend, takes the advice of no physician, and she
leaves under pretence of making a visit.

Can I conclude that there was any reasonable apprehension of
danger to Mrs. Smith?    I am not considering, at this point,
how it appears to me now, when all is past, and all the circum-
stances can be compared, but how it appeared to Mrs. Smith
herself; how she was then affected by the circumstances as they
arose.    My conclusion is that at the time Mrs. Smith left she
had no reasonable apprehensions of cruelty to herself.

She left her home and her husband.    He did not ask her or
order her to go.    For twenty-three days they had enjoyed every
conjugal right, if not the utmost conjugal happiness.    She left,
not because those rights or that happiness had been suddenly
marred or broken, but because her husband had ordered their
son to leave and to find another "stopping place."

Mr. Smith had a lawful right to order his son away from his
house.    This might have been a great moral offence to Mrs.
Smith, but it was not a legal one.    Certain it is, to my mind,
that had not Mrs. Smith joined her son in the obstinate resist-
ance to Mr. Smith's implacable hatred to Kendall, and had she

advised Kendall to leave and to keep out of the sight of her hus-
band, she could have remained with her husband in complete se-
curity. I can see no reason whatever to the contrary.

But has Mr. Smith been at fault since his wife left? Has
anything taken place since that event which will justify the
court in continuing the separation? As before observed, Mrs.
Smith left voluntarily. Mr. Smith did not tell her to go. He
says that Kendall urged her to go, and said, " Come, mother,
come," which is not denied. Mr. Smith told Kendall to leave
before dinner, and he and his mother took the afternoon to pre-
pare for leaving, in the meantime paying the servant and having
her leave with the understanding, it seems, that she should re-
turn on the 30th, and meet Mrs. Smith there. The testimony
proves this. For, on the 30th, when Mrs. Smith returned with
Mrs. May, she expected to find the servant there. She went to
the doorway, and was disappointed in not finding her there. She
was informed by Mr. Smith that the servant had been there, and
that he had told her that her services were no longer wanted;
and gave to Mrs. Smith as a reason that she (the servant) had left
because Kendall had.

Now, I think, I ought to observe that this last circumstance,
that is, the arrangement by Mrs. Smith with the servant that
they should both come back on August 30th, the third day after
leaving, is irrefragable proof that she was not apprehensive of
bodily harm from her husband.

Mrs. Smith and her sister reached Mr. Smith's house about
nine o'clock in the morning. Mrs. May says he let them in
and received them pleasantly. They remained until dinner-
time. Nothing of note transpired, except that Mr. Smith re-
fused to have any one come, as servant or otherwise. He told
Mrs. Smith that he did not want any one there but her. And
he refused to give Mrs. Smith money to buy a dinner for herself
and Mrs. May, or to go and buy them dinners. They soon sep-
arated. In November Mrs. Smith went back to her home, gath-
ered her clothes and took them away. While there she asked
for money and her husband refused her. She again left.

In these two meetings since Kendall left, I cannot see any dis-

play of feeling or force which could excite a reasonable appre-
hension of cruelty. Nor is there any proof of hatred. I would
say that Mr. Smith was, to all appearances, the same man in
mental and moral stature, that he was when he persisted in ac-
cusing Mrs. Smith of falsehood, and when he shingled Kendall
and refused him molasses candy or a supper. Both on August
30th and in November he met Mrs. Smith just where she left
him—at their home. At that home he always received her and
her friends kindly. At that home there is abundant evidence of
many joyous occasions to which he contributed. Mrs. Smith and
her home were supplied and furnished, not with extravagance, but
with an abundance. I speak generally, but it is true that he
wanted Mrs. Smith to keep an account and to bear her own ex-
penses, all which I cannot take into account now, because they
are not of a magnitude that shows anything beyond parsimony;
not evidence of such hate as would lead to bodily harm. It is
true he would not keep a servant, although he had done so for
years, and said he did not want any one there but Mrs. Smith.
The court cannot adjudge that there were cruelties or what should
excite reasonable apprehensions of cruelty. The court is not au-
thorized to regulate the domestic affairs of the family. If the
court can prescribe the number of servants, or can adjudge that
the husband who refuses to employ a given number, or that be-
comes parsimonious to meanness in his allowances to his wife, is
guilty of cruelty, our suits for divorce would soon be increased
by thousands. I do not say that these things may not be car-
ried to such an extremity as to give a right to sue. But this bill
is for judicial separation and for alimony, on the ground of ex-
treme cruelty. Hence, I repeat, that in my judgment, I cannot
say that it was cruel, or any evidence that Mr. Smith intended
cruelty in refusing to employ a servant, or to give his wife money
to buy a dinner, or to give her money in November when she
gathered up her clothes and was about to take them and leave
again. Why should the court undertake to compel the husband
to support his wife elsewhere, when he has a house and a home
for that purpose, because that husband will not allow a son to
abide in that house and home?

It is said that Mr. Smith has never asked Mrs. Smith to come back.  If I am right in what I have said, he was under no obligation, in law, to do so.  If he was not guilty of a legal wrong the law enjoins no duty.  If Mrs. Smith left without sufficient provocation, the first step at reconciliation devolves upon her ; she made the breach.  Has he been indifferent to obstinacy ?  So has she.  Has he been contented with her absence ? So she has been contented in being absent.  Was it cruel in him to make the most foul and infamous charge he did, and still more cruel to spread it upon the record ?  It is enough to say the prayer for judicial separation does not rest on that charge.  If I were to advise a decree in her favor on this account it would be a vain and idle form.  And there is no insistment that Mrs. Smith left home on account thereof.

And, therefore, from this present standpoint, considering all the facts and circumstances, I find myself unable to adjudge that Mr. Smith has said or done anything to excite a reasonable apprehension of extreme cruelty to Mrs. Smith.

I have been urged to consider that Mrs. Smith is a noble, kind-hearted, Christian woman.  I have done so to the fullest extent.  As far as possible I have taken the mental and moral characteristics of both parties into consideration.  I have also allowed for the infirmities and weaknesses of poor human nature. But the doctrine of the religion which is called in to elevate and sanctify the judgment goes far deeper than sentiment.  It lays down rules that are infinitely more inexorable and exacting than legislative enactments.  It teaches us the most valuable, and, oftentimes, the most painful lessons of life, such as, " If thy right eye offend thee pluck it out and cast it from thee," and " Wherefore, if meat cause my brother to offend, I will eat no flesh while the world standeth."  I believe that if Mrs. Smith had applied these wholesome rules to her son Kendall, she would not have been in court to-day.  And since this phase of the question was so fully opened, I am sure I will not be considered at fault in saying that I most sincerely regret that it nowhere appears that any reasonable effort was made by Mrs. Smith before suit was brought to determine whether or not she could abide in

Smith v. Smith.

peace and safety in the absence of Kendall in the home and with the husband she voluntarily left. It may be that her husband will shut his door against her; he has not yet done so; he has always received her pleasantly. It may be that he will treat her with the cruelty contemplated by the statute, as he did, it may be, on two occasions; but I find that Mrs. Smith did not leave on that account; and I also find that that cruelty was not the result of hatred to her, and I can discover no reason for believing that it will be repeated if Kendall keeps away, and Mrs. Smith pays proper regard to Mr. Smith's wishes, feelings and prejudices in this respect.

I think the policy of the law and the facts require me to come to these conclusions.

I have endeavored to consider Mr. Smith's lawful standing. I have not a word to say in justification of many things which appear.

I will advise that the bill be dismissed; that the defendant pay the complainant's costs to be taxed, and an additional counsel fee of $500. It may be urged why give additional counsel fees. when the bill is dismissed? I think this is in accordance with well-settled practice, and especially when the suit has been prosecuted in good faith, as I believe this has. Besides, I have seen no reason to mistrust the sincerity of the eminent counsel engaged on behalf of the complainant.

*Mr. Cortlandt Parker* and *Mr. Joseph D. Bedle*, for the appellant.

*Mr. H. C. Pitney*, for respondent.

Legal propositions.—The jurisdiction of the court in the premises is wholly statutory. It has no power to interfere to. grant a divorce from bed and board, except for one cause—extreme cruelty.

It seems to me that the force and effect of the word "extreme" in this connection have not been, at all times, fully attended to by the court in dealing with cases of this sort.

Webster defines it as follows: 1. Outermost; utmost; furthest.

2. Greatest; most violent; as extreme pain, grief or suffering. 3. Last.    4. Utmost; worst or best that can exist or be supposed.

It seems clear that the legislature could not have adopted such a word, unless it had intended that the cruelty requisite to warrant interference of the court should be of an extraordinarily serious and dangerous character.    It must have been intended to establish (so to speak) a higher standard of cruelty in this state than in most of the other states in the Union or in England.

But, without giving to this word its real inherent force in the construction of the statute, the following propositions seem clearly established :

1. The cruelty must be such as to seriously threaten to seriously injure the person or health of the wife.

The question is not so much what has taken place in the past, as what will probably take place in the future.

The past is important only in foreshadowing the future.

The action of the court can be invoked only to protect from physical suffering or injury.

Mental suffering has weight only so far as it may lead to physical suffering, or permanent injury to health.

Quarreling, bickering, matrimonial disputes, incompatibility of temper &c., all go for nothing.

2. The acts constituting the cruelty must be the willful, conscious acts of the husband or wife, as the case may be, and must be the offspring of a passionate, uncontrollable, ferocious, brutal or malicious disposition or actual hatred.

3. Acts or language which are the offspring of insane delusions can never constitute legal cruelty.

The party must be essentially guilty.    There must be actual guilt in order to charge the party with cruelty.

4. A charge of adultery, standing alone, does not amount to extreme cruelty.    A fortiori it does not when made in good faith, or as the result of insane delusions.

5. The conduct of the complaining party must not have contributed to or induced the conduct relied upon to constitute cruelty.    And the circumstances must be such that no reasonable

change of conduct on his or her part will produce the necessary
relief.

LEGAL EFFECT OF THIS INSANE DELUSION.—Conduct caused
by insanity in any form or degree can never form the basis of
judicial separation under our statute.

In one of the cases cited, the English judge says : " It is rather
the ground for restraining the husband than of judicially sep--
arating him from his wife."

What is " cruelty ? "

There can be no malice, no guilty ferocity, no brutality, none
of the elements of " cruelty " in an act which is the offspring of
an insane delusion.

A physical injury to his wife which results from an insane
delusion, and therefore does not involve guilt in the husband, is
no breach of marital duty on his part, either in law or morals,
and therefore does not absolve the wife from her duties as a wife.

Extreme cruelty on the part of the husband to the wife is such
a legal breach of the marital duty as absolves the wife—provided
there is danger of its continuance ; the object of the law being to
protect the wife in the future, not to punish for the past.

It is all very well for this court to feel inclined to exercise its
power to protect a wife from injury at the hands of her husband
by decreeing a separate maintenance, and perhaps the power of
the English courts in that respect was unlimited by statute.

This must be borne in mind in considering the cases.

But the court of chancery of this state has no power to do so
except in one case, viz., " extreme cruelty," and those words
involve moral guilt and conscious wrong—guilt such as would
induce legal punishment.

I deny that it is at all applicable to any act resulting from
insanity. To extend it to such is to legislate, not adjudicate.
However, as I shall show, the question is not necessarily in-
volved in this case. I cite all the authorities on this point.
*Stew. on Mar. & Div.* § *264; Curtis* v. *Curtis, 1 Sw. & Tr. 192 ;*
reported more at length in *27 L. J. (Pr. & Mat.) 73*—case of
a civil engineer, and, on the whole, very instructive ; *Hayward* v.
*Hayward, 1 Sw. & Tr. 81*—case of a crazy wife suing for resto--

ration of marital rights; *Marsh* v. *Marsh, 1 Sw. & Tr. 312 ; 28 L. J., (Pr. & Mat.) 13*—case of a farmer who had *delirium tremens* resulting from drink; *White* v. *White, 1 Sw. & Tr. 591 ; Hall* v. *Hall, 3 Sw. & Tr. 347 ; 33 L. J. (Pr. & Mat.) 65.*

ASIDE FROM THE EFFECT OF INSANITY.—There is no difficulty in solving this case in favor of the husband without the aid of that shield.

This insane delusion did not pervert defendant's conscience or reason, or lead him to do any act or take any course which was not perfectly justifiable had his delusion been real—justifiable in law and in morals.

He used no violence.

He did not turn his wife out of doors, or treat her with any harshness, physically—did not beat, or curse, or maltreat her.

The worst he did was on the one occasion to accuse her of the offence in the presence of a relative.

The question, then, is reduced to this :

If a man, laboring (honestly, of course) under an insane delusion of unchastity in his wife, charges her with it, is he guilty of extreme cruelty in law to such an extent as to warrant judicial separation ?

The question is answered as soon as asked.

A charge of unchastity, even when known to be false, has never been held, standing by itself, to amount to extreme cruelty. It is, at most, only an element of cruelty, having more or less weight when connected with acts of actual cruelty; but when made honestly—with an honest belief of its truth—amounts to nothing.

I cite *Stew. on Mar. & Div.* §§ *264, 267 ; Kennedy* v. *Kennedy, 73 N. Y. 369, 374,* where Chief-Justice Church says : "If, on the other hand, these charges were made in good faith, and especially if the defendant had reasonable grounds for believing them true, and if the threats proceeded from mere casual ebullitions of passion and were used to emphasize the charges which the defendant had reason to believe were true, and without any real intention to inflict bodily harm, and if the plaintiff had no sufficient reason for so believing, it is clear she would not be

entitled to a divorce. If a husband has reason to suspect his wife of infidelity, it is neither cruel nor inhuman to charge her with it, although personal violence is not justifiable." *Durant* v. *Durant, 1 Hagg. Ecc. 733 ; 3 Eng. Ecc. 310, 322, 327.* A case of repeated acts of adultery by the defendant, partly condoned by the wife, and then repeated, accompanied with a false charge of adultery against the plaintiff.

The question there was whether a deliberate false charge of adultery revived former cruelty and adultery which had been previously condoned.

The judge said (p. 327) : " Here is not cruelty which would support a sentence [of separation] *propter sœvitiam,* but here is an act which might be pleaded as such in conjunction with other circumstances.

" By some authorities in the civil law, this was held to be a distinct ground of separation. * * * These courts and the law of this country have not gone the length of recognizing it as a substantive ground ; but it is a fact, among others, *per quod consortium amittur.*"

To the same effect is *Bray* v. *Bray, 1 Hagg. Ecc. 163 ; 3 Eng. Ecc. 76.* In this state, *Yule* v. *Yule, 2 Stock. 138,* is no adjudication on the point.

*Cook* v. *Cook, 3 Stock. 195,* is in exact accord with the rule laid down in *Durant* v. *Durant.*

There was actual violence in one instance. There were frequent threats, accompanied with repeated charges of unchastity, and the charge was offensively set up in the answer, and attempted to be sustained by the proofs in the cause. The chancellor put the case upon the ground of danger of bodily injury. The conduct of the husband in that case is in marked contrast with that in this case.

*Graecen* v. *Graecen, 1 Gr. Ch. 459,* goes no further than to consider a charge of adultery as an item, with others, to show that it was unsafe to continue cohabitation.

The threats of violence in that case were very terrifying, and there was also actual violence proven.

Besides, that was the case of a conspiracy by the husband

with a lewd man·to have adultery committed, or to have his·
wife found in a compromising position, and so fasten and prove·
a false charge upon her.

This is a very different thing from merely expressing an.
honest belief of guilt.

It is one thing to barely charge crime against another. It is
quite another thing to fabricate false evidence of the charge and
attempt to fasten it upon the victim.

To hire a man, as Graecen did, to make a simulated attempt
upon his wife's virtue, and enter the sanctity of her bed-chamber·
in the presence of·witnesses, so as to have it appear that she was·
actually guilty of adultery, and so lay foundation for a divorce,.
is a very different thing from a bare charge of adultery.

*Thomas* v. *Thomas, 5 C. E. Gr. 97,* is a case of the same·
character—fabricating false evidence against the wife.

In *Black* v. *Black, 3 Stew. Eq. 215,* the question was not in-
volved, since the vice-chancellor held the charge not proven.
All that he said on the point was *obiter.*

*Close* v. *Close, 10 C. E. Gr. 526.* It was here admitted that
the injury must be physical, as distinguished from mere mental
suffering. And there was abundant evidence of settled hatred,
numerous threats and many instances of personal violence. The
circumstances showed great· danger of. its repetition. Defendant.
was addicted to drink, and had a violent temper.

I cite the following instructive English cases on the whole·
case :

*Brown* v. *Brown, L. R. (1 P. & D.) 46*—drunkenness and
imparting to wife venereal disease ; *Milford* v. *Milford, L. R.
(1 P. & D.) 295*—repeated adulteries and some violence ;.
divorce refused ; *Morphett* ɤ. *Morphett, L. R. (1 P. & D.) 702*—·
adultery and imparting to wife venereal disease ; the divorce was.
refused, because it was not proven that the disease was knowingly·
communicated.

*Kelly* v. *Kelly, L. R. (2 P. & D.) 31, 59.* There was actual.
imprisonment and seclusion of the wife from friends and society·
until her health suffered and her reason was threatened.

Cases where divorce was refused in New Jersey : *Coles* v. *Coles,.
5 Stew. Eq. 547 ; Laing* v. *Laing, 6 C. E.·Gr. 248.*

WIFE'S CONDUCT.—The rule is clear that the wife's conduct must be such as to be substantially free from blame. The case must show that a different course of conduct or not unreasonable change in her conduct would not have changed the husband's conduct. *Coles* v. *Coles, 5 Stew. Eq. 547; Stew. on Mar. & Div.* § *270; Hughes* v. *Hughes, L. .R. (1 P. & D.) 218; Waring* v. *Waring, 2 Phillim. 132 ; 1 Eng. Ecc. 210 ; Best* v. *Best, 1 Addams 411; 2 Eng. Ecc. 158, 163, 168.* Where the violence of husband was provoked by wife. *Monckton* v. *Monckton, 2 Barb. Ch. 309, 310.*

The opinion of the court was delivered by

SCUDDER, J.

The complainant, Alicia A. Smith, filed a bill for divorce from bed and· board against her husband, Richard Smith, for extreme cruelty, under the act concerning divorces. On motion for alimony *pendente lite,* counsel fees and other provision for the conduct of the suit, the chancellor made such allowance and provided for the expenses of the suit as it should progress.

The opinion on this motion for alimony, based on the bill and affidavits thereto annexed, will be found in *6 Stew. Eq. 458.* On bill, answer and proofs, a decree was subsequently advised dismissing the bill, but allowing costs and counsel fees to the complainant. Both parties appeal from the adverse portions of this decree.

The facts are fully stated in the opinion of the vice-chancellor, and such only will be here repeated as are necessary to show the grounds of our decision. The term "extreme cruelty," used in our statute, it was argued on the part of the defendant, gives another and a stronger meaning than the word "cruelty," alone, which is found in other laws. It is, however, but another definition of the word *sœvitia,* which is taken from the civil law, and has long had a recognized meaning in the ecclesiastical and divorce courts. This meaning has been evolved rather by an application of the term to the particular facts of each case as it has been presented, ·than by an attempt at exact definition of it which will be appropriate to all cases. Lord Stowell, in *Holden* v. *Holden, 1 Hagg.*

38

*Ecc. 453,* says "that everything is, in legal construction, *sævitia,* which tends to bodily harm, and in that manner renders cohabitation unsafe; whenever there is a tendency only to bodily mischief, it is a peril from which the wife must be protected, because it is unsafe for her to continue in the discharge of her conjugal duties; and to enforce that obligation upon her might endanger her security and perhaps her life." In this he but follows the leading case of *Evans* v. *Evans, 2 Hagg. 35,* in which the great ability of this famous jurist was so conspicuously shown. In that he says : " In the older cases of this sort which I have had an opportunity of looking into, I have observed that the danger to life, limb or health is usually inserted as the ground upon which the court has proceeded to a separation." Sir Herbert Jenner Fust, in *Dysart* v. *Dysart, 1 Rob. Ecc. 470, 478,* further illustrates and applies this term to other facts with like conclusion as to its meaning. In *Milford* v. *Milford, L. R. (1 P. & D.) 295,* it is said the ground of the court's interference is the wife's safety, and the impossibility of her fulfilling the duties of matrimony in a state of dread. Bishop, in his work on *Marriage and Divorce vol. I.* § *717,* does not depart from the expressions in the older cases in defining cruelty, and cites many, in his note, from which it is derived.

The recent handy reference-book—Stewart—on the law of *Marriage and Divorce* § *261 &c.,* has collected the words used in many statutes, and the construction put upon them in cases which define and illustrate this subject. With some showing of variation and tendency to get away from the severity and narrowness of the rule in its application to cases of peculiar hardship, there have been a pretty steadfast agreement and adherence to the definition of the term " cruelty," as a ground for judicial separation found in the older cases.

The case of *Close* v. *Close, 10 C. E. Gr. 526,* in this court, clearly established the rule that extreme cruelty, as used in our statute, may be directed either to the safety of the person or to the health of the aggrieved party, and it is not necessary that it be actually inflicted, it is sufficient if it be reasonably apprehended; that no rigid rule can be prescribed to define it, and each

case as it arises must be determined by the sound discretion of the court, according to the circumstances which attend it. The earlier cases in our court are there cited and the weight of authority considered and decided. Vice-Chancellor Van Fleet, in *Black* v. *Black, 3 Stew. Eq. 215, 221,* follows this case, and vigorously states the rule of legal cruelty in its application to the facts of the case in hand.

When the present case was before the chancellor, in the application for alimony and expenses of the suit, in examining the right to such relief he considered the case made in the bill, and gave his views upon it as determining the action to be taken by him. Assuming the charges therein contained to be true, and legally proved, his opinion is so carefully and exactly expressed that I would wish neither to qualify nor add to it. Putting aside the many minor facts of the case, he dealt with the strong peculiar feature of it, and characterized it and the treatment that followed it as cruelty which would entitle the complainant to relief. There are many vexatious things said and done, which appear in the proofs, that are of little weight and hardly relevant, except as they portray the disposition of the defendant, and the character of the infirmity which he now invokes for his justification. These will be found in the opinion of the vice-chancellor, so far as he thought necessary to repeat them. If this wife had been troubled with mere suspicions of criminality by her husband's attentions to others, and her feelings wounded or jealously excited thereby; if he had treated their son in his childhood and manhood with petulance or passion and sent him from home, not because he was unruly, spoiled, false and disobedient, as he alleges, but from caprice and without regard to her affection for their only child; if he had accused her of falsehood because she did not return home at the appointed times, was mean in refusing her money when she asked for or needed it, and wished her to pay her personal expenses with the income or principal of about $3,000, received from her father's estate, which was a small sum in comparison with the amount of his property and receipts from his business as a prosperous jeweler; if he had exacted or required attention and confinement by reading to him or walking

Smith *v.* Smith.

with him, and disturbed her by his restlessness, wearied her by needful watching and care of him through the nights, or by other acts of like significance given in detail in the evidence—these would all be classed with the petty vexations and trials incident to the lives of many married women, often hard to bear, but for which the law affords no relief. The essential points of legal cruelty which will justify a separation, are found in none or all of these facts combined. They had lived together as man and wife from November 7th, 1854, and might have continued to do so while they lived if nothing more had occurred. But on or about July 18th, 1880, he charged his wife with incest and criminal intimacy with their son, who was at that time living at home, was his father's partner in business and about twenty-six years of age. She testifies—

"That about two o'clock in the night he got up and dressed, and went about a block from the house, he said, for the purpose of getting a drink of water; he returned, undressed and went to bed; immediately after retiring to bed, he rose partly up, held me firmly, taking me by the shoulders, and, with a very excited look, said : 'How long has this been going on?' I said 'Richard, I don't know what you mean;' he said 'Yes you do, and forgive you I cannot, if for life or death;' he said 'When I wrote you that letter things looked just like midnight darkness; I tell you I never will be well while Kendall [the son] remains at home; he must go to California, and you must tell him to do so;' I was greatly alarmed, and went to the door and called our son; he went to Kendall's room and bolted the door, sat down by his bed, and asked him, 'How long has this thing been going on?' and he said to him that he did not know what he meant; he said 'You know what I mean;' Kendall replied that he did not; shortly afterwards he unbolted the door and went down stairs."

The wife says that on his return to their room he told her why he said that. He said :

"That the night Kendall came from Monmouth Beach, it was the 8th of July, that Kendall came to my room and locked the door, and he said there must be wrong-doing—improper relations—or the door would never be locked; I tried to reason with him, and remove his unfounded suspicions, but I utterly failed; I told him that I was very glad that I could recall the circumstances, and I told him that night that we had received a letter from our sister-in-law —Mr. Smith's sister-in-law; it was a family letter, and we had read it, and a

Smith *v.* Smith.

'portion of it was addressed to Kendall; I told him Kendall had not had an
·opportunity of reading it, and I wanted him to read it that night, and he was
.at the bureau reading the letter; at the extreme end of the hall the window
was up, and there was a circulation of air which made the door swing back-
wards and forwards; at first I closed the door, but the catch was out of order,
. and it would not remain closed, and then I locked it, only in consideration of
Mr. Smith, for I was anxious to keep him asleep, and supposed he had re-
' tired."

But Mr. Smith was watching outside the door, as he afterwards
told her. He said he did not believe her. The son corroborates
her statement of the occasion for this charge. On the next
morning he met his son in the sitting-room, and requested him to
settle up the accounts in the store, as he wished him to go to
California. He refused to go, and was upbraided for changing
his mind after he had promised to go. At that meeting the
father charged the son with being in his mother's room, and that
criminal intercourse had taken place. He says he indignantly
denied it, and told him that if any other man had said that to
him he would not have given him time to draw another breath.
Within about ten days after, Mrs. May, a sister of Mrs. Smith,
. and her son came to visit them. At the table, in their presence,
Mr. Smith commanded his son not to look at his mother; he said
they were lover's glances, and he would not have them. He
made the same vile charge to the sister, in effect, by asking her
what she thought of the conduct of a mother and her son locked
in the same room together.

This accusation is expressly charged in the bill, is answered
. and not denied in the defendant's answer, but there repeated, as
his honest belief at the time, and it does not appear that he has
·changed it. It is proved by the testimony of Mrs. Smith, her
. son Kendall, Mrs. May, and Frank J. May, her son, in part.
It stands, therefore, without contradiction. In *Bray* v. *Bray, 1
Hagg. 163,* Sir John Nicholl said, in a case where a man accused
his wife of incest with her uncle, and having a child by him,
when the charge was admitted by him on an examination in
· court, that " it is not possible to conceive cruelty of a more griev-
ous character (except, perhaps, great personal violence) than the
: accusation made by this husband against his wife." It may not

be within the legal definition of cruelty, as given in the fore-
going cases, and it is not necessary so to hold in this case, for
this charge was followed by personal violence to the wife. On
the day when Mrs. May and her son were at dinner with them,
when Mr. and Mrs. Smith accompanied them to the door, Mr.
Smith seized his wife by the shoulders and pushed her forcibly
into the room, charging her with looking out of the window at
Kendall. She says he used force enough to throw her to the
other side of the room. On August 4th, when in his room dress-
ing, Kendall says he heard a loud outcry down stairs; he went
down; his mother and father were in the hall between the bed-
room and the parlor. His mother said his father had struck her;
he denied it, and ordered him up stairs, and he went, when his
mother wished him to. She says Mr. Smith came in and heard
her speaking to her son, who was on the third floor, while she
was on the second, at the foot of the stairs. He came up with a
bound—

"And with both of his open hands struck me forcibly right upon my shoul-
ders, so that I was lame for several days, and it prostrated me on the bed; he
said 'How dare you speak to Kendall?' then he took hold of me, and I cried
out with alarm, so loudly that I brought my son from the third story; I was
very much frightened, and I tried to get out of my room; he took me by the
shoulders forcibly and pushed me back, but I succeeded in getting out, and
when my son came down he asked me what was the matter."

The father says that he only pushed her, and did not hurt her;
that she lost her balance and went on the bed; that he afterwards
kissed her, and he heard nothing more of it until it was charged
in this bill of complaint.

These two acts of violence, although not very hurtful, and not
of much weight in themselves, yet taken in connection with the
foul charge he had made, and the evident malice he was bearing
against her and their son, assume the proportions of legal cruelty.
This accusation and these acts of violence for such a cause, are
harder for a faithful, virtuous and devoted wife to bear than the
cursing and abuse of a rude or drunken husband, excited by vio-
lent passion, though accompanied by blows on the body, which
inflict only external wounds. These are frequent grounds for

divorce, why not the other?  *Thomas* v. *Thomas, 5 C. E. Gr. 97 ; Kennedy* v. *Kennedy, 73 N. Y. 369.*

After this, she says he watched her persistently from morning to night.

" He never allowed me to go on the street; he never permitted me to leave my room alone; he would stand with his hand on the door-knob, as I was finishing my toilet in the morning, and wait until I passed out of the door."

He went into her room when she was bathing, and says he saw no bruises on her body.  He insulted her daily by such constant and indelicate watching.  He took the fastenings off the basement door and windows ; other fastenings were changed, and the door and stairs leading to the roof were altered so that a person could go on the roof.  No explanation was given her of these acts. She was ordered by him to go up in the third story to sleep alone. She says she thought the fastenings were arranged so that some one could enter the house, and was afraid to go up stairs.  He went out in the night to get a drink, as he alleges, and into the basement, leaving her in her bed, awake and frightened.

On August 27th he ordered the son to leave and find another place.  She testifies that the servant would not remain if Kendall left, and she was afraid to remain alone.  She feared bodily harm, and had feared it for some time, and could bear the strain no longer.  She went on that day to her sister's, in Paterson, where she has since remained.

Added to these circumstances, we have the further facts that in January, 1879, he had gone to Boston under great excitement about an election for directors of a bank in Newark, in which he was interested ; that he had jumped from the window into the street and had thrown himself in the water of the bay, where he was rescued nearly drowned ; that he was taken to a hospital, where his wife and son, summoned by telegram, found him ; that he resisted their bringing him home, struck his son in the face at the depot, and threatened that they would rue the day when they took him home against his will, and that he would never forget it as long as he lived.  He was taken to the asylum for treatment, under the advice of Dr. Dougherty, though his wife wished to keep him at home, and only yielded to the earnest

opinion of the physician, that he could be better cared for at the asylum, until he recovered from his excited condition. He blamed her and his son for permitting him to be taken there, and charged them with doing it. On his return home, he inquired for his revolver, and always kept it in his room. In July, 1880, while he and his wife were at Long Branch, occupying communicating rooms, he alarmed her. She says:

"He seemed to be very nervous and restless, and I would find him walking in his room in the middle of the night, and I think it was the first night I was there, I found him leaning over me, looking peculiar—bending over my bed ; as near as I can tell, it was twelve o'clock at night, and so he continued to walk back and forth for several nights."

She says he had a very peculiar and unnatural expression, very alarming, and she was very much alarmed ; and further, that after she returned home, and from the 16th of July until she left, on August 27th—

"I slept very little; I was kept in a state of alarm and anxiety all the time by watching and caring for Mr. Smith."

Notwithstanding all that had happened, she went back to him on August 30th, to make some arrangement to return and remain at home, if he would provide for her safety. He would have no servant, not the former servant, nor Kendall. He said if she returned, they should occupy separate rooms ; he gave her no dinner, and refused to give her any money.

His answer to all these charges, through his counsel, is, that he is under an insane delusion about his wife and his son ; that he is mentally excitable, of weak physical health ; that his wife never was in danger from him, nor did she fear him or have any reasonable grounds to fear ; that she prefers her son to her husband, and has provided him with money, to become a rival to his father in business. As to her fear of him, this is opposed by her evidence, for she testifies that she was alarmed while with him, and afraid to live with him alone, without some one to protect her. She offered to return to him, if the servant whom she had had at the time she left, could be with her, without Kendall, but he refused. If she did not fear him while she remained with

.him, and was even willing to return to him, she showed, in my judgment, more devotion and courage than discretion, and if this court should say it is still her duty to go back and live .alone with him, it could not be without the reasonable apprehen-.sion that she might be injured ; and whether she suffered bodily harm from his insane delusion, hatred or mental excitability, the ·effect to her would be the same.   His foul suspicion, which continues, would be both an insult and a menace to her, so long as .she remained with him, and within his power to hurt her.   He is not wholly insane, according to the evidence.   His is not a ·case of *dementia*, for which he is not responsible.   In 1880, from April to July, just before he made this charge, he went .alone to Europe, and he has always transacted his business with more than ordinary prudence and ability.   His answers on the witness-stand in this case do not indicate a want of intelligence ·as to his interests, or his position, except in the case of his charges against his wife and son of criminality ; but they show his willfulness, to which he evidently thinks his wife and son .must always submit themselves.

In *Hall* v. *Hall, 3 Sw. & Tr. 347*, the ordinary said : " The .sources of the husband's conduct are for the most part immaterial.   Thus I have no doubt that cruelty does not cease to be a ·cause of suit if it proceed from ' violent or disorderly affections,' .as is said in one case ; or from ' violence of disposition, want of .moral control, or eccentricity,' as said in another ; or from ' lia-.bility to become excited in controversy,' in the language of a .third ; but madness, *dementia*, positive disease of the mind—this is quite another matter.   An insane man is like enough to be ·dangerous to his wife's personal safety,. but the remedy lies in the restraint of the husband, not the release of the wife."   I think the chancellor was right in this case (*6 Stew. Eq. 461*) when he said .a distinction is to be made between a case of insane delusion, such .as this is alleged to be, and a case where the husband is shown to be insane generally.   In the latter case the wife may obtain protection through appropriate proceedings to cause her husband .to be declared a lunatic.   But how can this wife restrain her husband so that his delusion, suspicion or hatred of his son, and of

her also, shall work her no harm ?   Or who will say that there
is not a reasonable apprehension that he may do her bodily injury
if she shall return to him, as he demands, alone ?   If this be her
position, then she is entitled to the protection of the court and a
judicial separation should be allowed her.   As he has shown no
sign of relenting or improvement in his feelings towards her from
the time he made his accusation against her, the divorce from bed
and board should be perpetual.

The costs of the complainant in this court, and a counsel fee
of $300, will be allowed, and the costs and allowance for counsel
below affirmed.   The case will be remitted to the chancellor, that
it may be proceeded in and alimony determined, by reference or
otherwise, according to the practice of the court.

The decree will be reversed.

*Decree unanimously reversed.**