FRANK JULIAN, petitioner-respondent,

*v.*

MATILDA JULIAN, defendant-appellant.

[Argued October 23d and 24th, 1939.  Decided February 5th, 1940.]

*Mr. Herman E. Dultz,* for the respondent.

*Mr. Harry Unger,* for the appellant.

The opinion of the court was delivered by

RAFFERTY, J.

Frank Julian and Matilda Julian were married in Newark· September 9th, 1907, and have resided continuously in this state during their married life. Seven children were born of· the marriage, four of whom at the time of the filing of the petition for divorce resided with petitioner and one, the· youngest daughter, with defendant. Two of the children are· married and have established homes for themselves.

The petition filed by the husband prayed for divorce from the marriage on the grounds of simple desertion, constructive· desertion and extreme cruelty. The wife answered, denying the essential allegations of the petition and by way of counter-claim asked that she be granted a divorce from petitioner on the grounds of desertion, extreme cruelty and adultery. The· court of chancery awarded a decree of divorce to the petitioner-husband, holding that he had proved both deser--

tion and extreme cruelty and denied the counter-claim of the wife. From the decree of divorce thus granted this appeal is made.

A careful study of the testimony adduced at the trial of the matter leads us to the conclusion that the decree below must be reversed, and that a decree of divorce in favor of the wife, appellant here, on the ground of adultery of the husband, should be entered.

The testimony establishes that the married life of these parties has been attended throughout with great strife. Each has caused the other to be summoned before police courts, domestic relations court, and the court of chancery. Each has been under the supervision of the Essex county probation department. It would serve no useful purpose to discuss in any detail the frequent assaults alleged to have been made upon each by the other, nor the vile name-calling of each other which seems to have characterized their married life. An earlier suit in chancery for divorce on the ground of extreme cruelty was instituted by the wife. The husband answered denying the allegations of cruelty. Upon trial of the matter a decree dismissing the petition was entered.

The proofs in the instant case as to desertion and extreme cruelty contain charge and counter-charge with corresponding denials. The corroboration on the part of petitioner is supplied by three of the children, one a married daughter living apart from her parents, and the others, sons living with the father. In weighing the testimony of the children, however, it must be borne in mind that in a situation arising from such a family experience as is here indicated, the children must inevitably take sides and there can be no doubt but that their prejudices are reflected in their testimony. For instance, petitioner testified that at his request a married daughter arranged for a conference with Mrs. Julian at his residence, the mother then living apart from the father, and at this meeting he made an effort at reconciliation, but without success. The daughter testified that pursuant to the father's request she brought about this meeting; that her father and mother talked together in the living room, and that she and her sister stayed in the kitchen during the conver-

sation, but that she did not know what took place between her father and mother and that her mother said nothing to her about it after the conference. The mother testified that the conference took place during one of her permitted visits to the children who were living with the father; that it lasted about a half hour; that the husband made no effort at reconciliation, but that he had proposed to her that she "come to some kind of agreement and name the price that I wanted and to give him his divorce." Asked, "Did anyone hear this conversation?" she answered, "Well, she [the married daughter] said she would be there just on that account, to hear what was between us. Now, whether she heard it or not———." It strains credulity to believe that the daughter did not hear the conversation or a substantial portion thereof, or that the daughter did not pursue the mother or the father at the close of the conference to determine what was said and what result was reached. The testimony clearly discloses that any meeting of the parents brought a tenseness of attitude to all present and it cannot be doubted that the daughter did know what took place inside, but preferred not to testify in her father's behalf with respect thereto.

The count alleging extreme cruelty in the father's petition is substantially similar to the two counts alleging desertion, with the addition of an alleged attack upon the father by the mother in which the mother is stated to have broken a crockery vase over the father's head necessitating his being attended at a hospital and several stitches being required to suture the wound. According to the father and the children who testified in his behalf, the attack was wanton. According to the mother it was an act of self-defense. Whichever it may have been, it is insufficient to support a decree for divorce. The testimony is clear that it occurred during the course of a heated argument as to whether or not the father, then living apart from the mother, was at the moment privileged under a court order to be in the premises visiting the children.

Nagging, name-calling, however vile, failure to cook meals and complaints of like nature do not constitute sufficient cause for divorce on the ground of desertion. "A man cannot desert his wife because she is extravagant, or lazy, or swears,

or uses coarse language, or is sickly, fretful, or of violent temper; or because she wreaks her temper, or showers her coarse or profane language upon him, and thus make his life uncomfortable. Incompatibility of temper has not as yet, in New Jersey, been made by law a ground of divorce or for desertion." These "are not crimes, but the infirmities and defects which, in consideration of law, a husband undertakes to put up with when he takes his wife for better or worse." *Boyce* v. *Boyce, 23 N. J. Eq. 337, 349.* See, also, *Irwin* v. *Irwin, 88 N. J. Eq. 139, 140.* The instant case differs from *Doty* v. *Doty, 92 N. J. Eq. 660, 662.* In that case there was added to the long course of persistent abuse suffered by the petitioner-wife the grievous charge of infidelity to her marriage bed and other serious matter. In the instant case, although in opposite aspect, there is no charge or suggestion of infidelity on the part of the defendant wife, nor that she introduced into the home and entertained dissolute companions.

Nor can the elements here in proof, together with the breaking of the vase on the head of the husband, under the facts of this case, constitute sufficient cause for divorce on the ground of extreme cruelty unless it be shown that there is reasonable apprehension that the continuance of cohabitation would result in further injury. *Cavileer* v. *Cavileer, 94 N. J. Eq. 160.* The husband himself furnishes the answer to the query. He testified that on a number of occasions after the date of the acts complained of, he earnestly besought his wife to resume their married life. This, obviously, was offered as proof of the willfulness and obstinacy of the wife's alleged desertion. Taken on its face this is evidence that he had no reasonable apprehension that the alleged cruelty of the wife would continue. Otherwise his advances for reconciliation were not made in good faith, and the resultant implication is to his discredit.

We conclude, therefore, that the husband has not carried the burden of proof requisite to the establishment of his cause.

Passing the counts in the counter-claim based on alleged desertion and cruelty visited upon her by the husband, we may consider the matter of the alleged adultery of the hus-

band. As to this the wife testified that she and petitioner owned a bungalow property near the beach at Long Branch, Monmouth county, and that in May, 1937, she and a neighbor, a permanent resident of Long Branch, had occasion to go on the beach and while there she observed petitioner and a named co-respondent lying on the beach in suggestive pose and that from a bottle which they handed back and forth to each other, they apppeared to be drinking whiskey. Mrs. Julian and the neighbor were less than one hundred feet from the scene of this occurrence at the time. It appears that the bungalow had not yet been opened for the summer season and that the front door was fastened with a padlock, Mrs. Julian having the key to the rear door. Three days after the beach incident above mentioned, and while staying at the neighbor's home, which was immediately adjacent to the bungalow, Mrs. Julian noticed that the padlock was taken off the door and that the shades of the bungalow were drawn tight. Upon going to the door and trying it she found it was bolted from the inside and she could not open it. Observing her husband's automobile in the immediate neighborhood, she called police headquarters and upon a lieutenant of the local police force coming to the premises another unsuccessful effort was made to gain entrance to the bungalow. At the suggestion of the police officer Mrs. Julian went to the rear door to open it with her key. As Mrs. Julian put the key in the door to open it Mr. Julian came to the door in shirt sleeves and was adjusting his clothing. She testified, "There was no shade or curtain on the back door. There was just the glass between us," and her demand to be permitted to come into the bungalow was refused. Her husband called to another person in the bungalow, "Are you ready, * * * and the next thing I knew I saw a woman running in through the dining room, because the dining room is right beside the kitchen, and I could look right through." The woman ran to the front of the house and ran off toward a field. Petitioner made off in the opposite direction. The police officer placed petitioner and the alleged co-respondent under arrest on an adultery charge, which was dismissed in the local police court.

The police officer, a wholly disinterested witness, testified

that on the day in question he responded to the call made by Mrs. Julian and substantiated her testimony as to the fact of the doors being locked and the shades drawn. He testified that Mrs. Julian went to the rear of the house to open the door with her key; that he heard some loud talking from the rear of the house, one voice being a man's voice, and that, "So when I heard the loud talking in the rear of the house I immediately proceeded back where I heard this loud and vile language taking place with Mrs. Julian and the person in the house was in some kind of squabble. When I was going around the side of the house a screen fell out of the side of the window and a woman's leg with a stocking on come out through the window. I immediately went back to the place and saw nobody and I went back to the rear again, and by that time, Mrs. Julian had secured entrance, and in the meantime I seen some woman running across the field." He testified that this woman had come from the front porch of the bungalow and that he thereupon arrested petitioner and this woman.

Saima Dahlman, the neighbor of Mrs. Julian, testified that she had known the parties for about fifteen years; that during the winter of 1936 petitioner had come often to the bungalow with the identified co-respondent; that the couple would go into the bungalow and that "sometimes they were there two hours and sometimes more. Sometimes I saw them come and saw them leave and saw the car in the yard." At all times the shades were drawn. She testified that she had advised Mrs. Julian of these visits and corroborated Mrs. Julian as to the beach episode before referred to. She was not present at the time of the arrest by the police officer.

In answer to this, petitioner denied that he had been to the bungalow with the co-respondent on these numerous occasions but admitted his presence on the day of the arrest. In response to the question, "Did you go there with this woman at all during the spring of 1936 and 1937?" he answered, "Well, I went there when I wanted to show it. She just come from the other side and she was trying to make a living and she thought she could rent a few rooms. Q. Is that the time you were arrested? A. Yes." Questioned regarding a bottle

of whiskey found in the premises at the time of the arrest, he stated that he always had a bottle at the bungalow because of the cold weather. The failure of co-respondent to testify in support of petitioner is unexplained.

The only disinterested witnesses in the case were the police officer and Mrs. Dahlman, and, notwithstanding the great weight due the fact findings of the learned advisory master who heard the testimony and observed the demeanor and attitude of the witnesses, the inference is unavoidable that the testimony of Mrs. Julian, supported by these two witnesses respecting the charge of adultery, established that charge unequivocally and that petitioner should have been adjudged guilty of adultery and a decree of divorce on that ground granted Mrs. Julian. *Berckmans* v. *Berckmans, 16 N. J. Eq. 122; Gilson* v. *Gilson, 116 N. J. Eq. 556.*

The decree of divorce granted to petitioner below is reversed. A decree of divorce for adultery in favor of the wife should be entered.

*For affirmance*—HETFIELD, WELLS, JJ. 2.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, DEAR, WOLFS-KEIL, RAFFERTY, HAGUE, JJ. 12.