HENRY EDWARD MACARTHUR, petitioner-respondent,

*v.*

HAZEL FLORICE MACARTHUR, defendant-appellant.

[Submitted February 1st, 1944. Decided May 15th, 1944.]

*Mr. Victor H. Schleicher* and *Mr. Samuel Kalisch, Jr.,* for the petitioner-respondent.

*Mr. Sebastian Gaeta,* for the defendant-appellant.

The opinion of the court was delivered by

WELLS, J.

This is an appeal from a decree *nisi* granting a divorce to the husband from his wife on the ground of her extreme cruelty and awarding her the custody of the two children, Carolyn, six years of age, and Susan, three years old, and directing the husband to pay the wife a certain sum per week for the support and maintenance of the infant children and a counsel fee to the solicitors of the wife. The appeal is from that portion of the decree which awarded the divorce to the husband. The ground of the appeal is that the evidence did not warrant the court in finding that the wife was guilty of the charge of extreme cruelty.

The parties were married on June 22d, 1935, and lived together until April, 1942, at which time the final separation took place. After this marriage the parties went to Flushing, New York, to live and got along there fairly well. In February or March of 1939, they moved to Bogota, New Jersey, and it was soon thereafter that serious marital troubles began between the parties resulting in the filing by the husband of a petition for divorce.

The alleged acts of extreme cruelty consisted of (1) physical abuse and (2) accusations of infidelity. As to the former, the husband testified that from the month of January to and including a part of the month of April of the year 1942 his wife on numerous occasions threatened his life and that on one particular occasion he was awakened to find his wife standing over him with a knife in her hand; that on other occasions she went after him with an ax and a poker. He also testified that his wife during this same period threw dishes, pictures and other missiles at him. These alleged acts of physical violence were not corroborated and were denied by the wife.

As to the accusations of infidelity, these were not only corroborated but were admitted by the wife on the witness stand, although in the answer filed by her she denied making them.

It appears from the husband's testimony that in the fall of 1939 he was employed by the Westinghouse Manufacturing Company as an electrical engineer and was engaged in war work at the Brooklyn Navy Yard and had informed his wife when he left home one morning that he thought he was going to work overtime that night and might not be home until very late; but that he arrived home between 5:30 and 6:00 P. M. and when he came in, his wife said, "What is the matter, did your date fall through?" That was the first time she spoke like that. This was the beginning of charges and accusations which were almost continuous until the final separation in April, 1942. She accused him of running around and having sexual relations with other women. She said he wasn't working overtime when he said he was but was out with other women and at the same time she accused him of frequenting a house of prostitution in Bogota and of taking his own daughter with him. Sometime the latter part of 1939 she accused him of being the father of a child of a business associate's wife. Every time he went home he got the same thing—at the dinner table and everywhere.

On October 30th, 1940, the husband, whose health had become very much impaired as a result of the constant accusations of infidelity made against him by his wife, consulted Dr. Beling, a practicing physician in Newark of forty years experience, specializing in nervous and mental diseases, and he told the doctor about his marital troubles and after visiting the doctor several times, the doctor asked him to bring his wife with him so he could talk to her. Finally, on February 6th, 1942, he prevailed upon his wife to go with him to see the doctor. The doctor testified that at this interview the wife made accusations against her husband, the gist of which was that he wasn't true to her. The husband said that at this interview he told his wife in the presence of Dr. Beling that he couldn't stand these accusations, and the doctor told her that, too, and her reply was that she didn't care what effect it had on her husband, that he should have

thought about that before he did those things, referring to his sexual relations with other women. The wife subsequently went to see the doctor alone. She did not deny making these accusations and statements to the doctor. On the contrary when, on direct examination, she was asked to tell the court how she came to go to Dr. Beling, she replied, "I went to Dr. Beling because I thought I might be able to have my husband tell the doctor the truth," and in reply to the question as to what she meant by "truth," she said: "That he was unfaithful to what I considered an abnormal degree, and that Dr. Beling might be able to help him see things differently."

On March 28th, 1942, after one of the many attacks the husband testified the wife made upon him, he went to the chief of police of Leonia with the intention of making a charge of assault and battery against his wife, but the chief dissuaded him from doing so and accompanied the husband to his home for the purpose of having a talk with the wife to see if he could straighten out matters so that he wouldn't be called into the case again. He made four calls all told upon the wife, but she continued to repeat the accusations about her husband consorting with other women. As a result of these conferences, the chief advised the husband to leave the home, that the environment was not good for either husband, wife or the children. On the witness stand the wife unhesitatingly admitted making all the accusations, heretofore recited, to her husband and repeating the same to Dr. Beling, Chief of Police Small and to others. Her attitude was one of justification and her reasons were as follows: (1) That when her husband was making $150 a month, he had only $15 a week that she could use for the house and clothing for herself and children, and she added, "There is some reason for a man spending that much money;" (2) that she found in the automobile a woman's comb, hairpins, cigarette stubs stained with lipstick; (3) that the husband had admitted that he had been unfaithful. The wife admits that she did not say anything to her husband about the stained cigarette stubs and that when she confronted her husband with the comb, he denied knowing anything about it. He denied ever

being unfaithful to his wife. There was no corroboration whatever of her story.

In the opinion of the learned advisory master the above facts did not justify the wife in concluding that the husband was guilty of infidelity; nor did they give her reasonable grounds for suspicion or provocation. With this we are in accord. We think that it is fully established that the wife did repeatedly accuse her husband of infidelity and that she offered no credible testimony as to her justification for these accusations.

It is difficult to define with accuracy the exact meaning of the term "extreme cruelty" as used in the statute. To justify a divorce on that ground actual physical violence need no longer be proved. *Doty* v. *Doty, 92 N. J. Eq. 660.* In *McCabe* v. *McCabe, 129 N. J. Eq. 431* (at *p. 433*), this court said: " 'Extreme cruelty,' as used in our Divorce Act," (referring to *R. S. 2:50–3(c)*) "is such cruelty as endangers the safety of the person or the health of the aggrieved party, either actually inflicted or reasonably apprehended. *Cavileer* v. *Cavileer, 94 N. J. Eq. 160."* This court also said in *Fallon* v. *Fallon, 111 N. J. Eq. 512* (at *pp. 516* and *517*):

"Nor is a false charge of adultery extreme cruelty *per se.* To constitute extreme cruelty such a false charge must be maliciously or wantonly made, and must be made under circumstances which in fact cause anguish and pain of the extreme nature contemplated by the definitions. Even then, if the accusation be made under stress of reasonable suspicion caused by the wife's conduct, it does not amount to extreme cruelty. *Barton* v. *Barton, 97 N. J. Eq. 404; Hill* v. *Hill, 97 N. J. Eq. 237.* * * *

"The court must in each case look to the effect of the conduct complained of upon the health, mental and physical, of the wife or husband for it is an essential element of extreme cruelty that its effect upon the mind or body of the aggrieved spouse shall have been substantially deleterious, or that if allowed to continue, it reasonably would have become so."

It has also been held in numerous cases in this state, that where one spouse exhibits contempt for another spouse and

accuses that spouse of infidelity with utter disregard and indifference for the spouse's feelings, and as a result the offended spouse suffers mental stress and experiences a nervous breakdown, the offended spouse is entitled to a divorce on the ground of extreme cruelty; *Cf. Ross v. Ross, 105 N. J. Eq. 170,* also *Haskell v. Haskell, 99 N. J. Eq. 399; Chamberlain v. Chamberlain, 121 N. J. Eq. 234; Hill v. Hill, 97 N. J. Eq. 237; Feybusch v. Feybusch, 110 N. J. Eq. 358.*

The next question is whether or not the conduct of the wife in the instant case with its consequent effect upon the husband brought the case within the purview of the statute as construed by the decisions of our courts. We think it did.

The husband testified that as a result of the constant accusations of infidelity made against him by his wife he became nervous, irritable with his men, that his stomach was upset, his appetite diminished; he lost weight, became fearful of his life especially of what might happen to him when he was in bed asleep; that he did everything possible to save the marriage and to convince his wife of the falseness of her charges yet she persisted, without any reason, in making them until he was unable to see any hope in the situation and arming himself with a revolver he went to the cellar with the intention of committing suicide but didn't have the nerve. The husband produced corroboration by various witnesses, including his mother, fellow workmen, and doctor as to the effect of these accusations upon his physical and mental condition.

Dr. Beling testified that the husband was very nervous, upset, excitable and unstable and ascribed it all to his marital difficulties and pronounced his condition serious and said that medicines would not effect a cure and the sedatives which he prescribed afforded only temporary relief; that the condition should be remedied and that it could be done only by settling his marital difficulties. The attitude of the wife made this impossible so long as they continued to occupy the same house. After the separation his condition greatly improved.

Thus the question is whether the proofs come within the stated applicable principles of law. The advisory master

who saw the witnesses and observed their demeanor while testifying concluded that the husband was entitled to a decree based on these unwarranted charges and accusations of infidelity; that they were not only constant and persistent, but were false and malicious; that they were made wantonly, without reasonable suspicions, excuse or provocation and were visited upon and were brought to the knowledge of the petitioner causing him great pain, anguish and mental stress; citing *Hauenstein* v. *Hauenstein, 95 N. J. Eq. 34; Hill* v. *Hill, supra; Barton* v. *Barton, 97 N. J. Eq. 404; Ross* v. *Ross, supra; Feybusch* v. *Feybusch, supra.*

We have carefully examined the proofs and the law submitted by counsel for the respective parties and have reached the conclusion that the advisory master was fully justified in his findings of the essential facts and correct in his application of the law to the facts so found.

The decree is, therefore, affirmed.

*For affirmance*—PARKER, CASE, BODINE, PORTER, DEAR, WELLS, HAGUE, DILL, JJ. 8.

*For reversal*—THE CHIEF-JUSTICE, DONGES, HEHER, PERSKIE, COLIE, RAFFERTY, JJ. 6.