ELLY APPEL GREWE, petitioner-appellant,

*v.*

HINRICH D. GREWE, defendant-respondent.

[Argued February 8th, 1946. Decided June 27th, 1946.]

*Mr. I. Oscar Spevack (Mr. Samuel S. Cohen,* of counsel), for the petitioner-appellant.

*Mr. David T. Wilentz,* for the defendant-respondent.

The opinion of the court was delivered by

WELLS, J.

On August 6th, 1943, the wife filed a petition for divorce. An amended petition was filed February 25th, 1944.

The parties were married on April 30th, 1922, in Germany. They came to New Jersey on October 3d, 1923, where they

have both lived ever since. Two children, Rudolph and Margaret, were born of the marriage. At the time of the hearing Rudolf was in the service somewhere in the Pacific, and Margot was living with her mother. They are now both of age.

The amended petition charges that the husband was guilty of extreme cruelty towards the wife.

Particularly specifying the acts of extreme cruelty committed by the husband, the wife says: on August 5th, 1940, the husband, while under the influence of liquor, was driving his automobile, in which she and her children were passengers, in a reckless manner, and attempted to kill all of them by running into a pole; on May 10th, 1941, the husband refused to support the wife and her children and threatened to kill her with a pipe; on January 8th, 1942, the husband chased his wife, brandishing a long fishing knife; on October 2d, 3d, 9th, 10th, 16th, 17th, 23d and 24th, 1942, the wife and her children were forced to flee the house for fear of their lives, because of the vicious conduct that the husband exhibited while under the influence of liquor; on December 21st, 1942, the date of the last act of cruelty complained of, during a drunken rage, the husband carried the wife into the kitchen and attempted to choke her, and she had to beg and scream until she was finally released. By reason of the said acts of cruelty, the wife says that her health became impaired and her life was rendered one of utter wretchedness and misery.

The husband in his answer and in his testimony denied the specific acts of cruelty set forth in the amended petition, and charged that the acts and dates were all fictitious and false. He says that he was never guilty of any acts of extreme cruelty, and denied that he had ever refused to support her or the children.

The learned advisory master found that extreme cruelty had not been established and advised a decree dismissing the wife's petition.

We agree with counsel for the wife that the issues "are essentially factual." The wife and her daughter, Margot, were the only witnesses to testify for the wife; and the husband and two neighbors were the only witnesses to testify for

the husband. The question of credibility was pre-eminently one for the advisory master to decide.

The testimony offered in behalf of the wife was greatly discredited by the admissions of both the daughter and wife on cross-examination and by the entries in the wife's diaries which were read into the record and admitted by the wife. It is significant that, while her diaries were filled with her comments on the events of her married life, no mention was made therein of the alleged attempt of her husband to kill her and the family in August of 1940; nor did it appear that there was anything recorded in her diaries as to any of the alleged acts of cruelty set forth in her amended petition. On the other hand, the diaries strongly support the testimony of the husband that the trouble was not caused by any act or acts of cruelty on his part. There can be no doubt that the wife was violently opposed to her husband's drinking beer, the smell of which she detested, or any other intoxicating liquor. She testified that her husband's drinking was the biggest trouble in their married life, but admits that money was also a factor because they were always "short." As early as May of 1940 she was insisting that her husband should pay all the bills and give her $10 a week for her clothes and for savings.

She at that time wrote in her diary that she had made up her mind then to ask for a separation and to leave her husband. On September 7th, 1940, she did leave her husband and didn't return until December 8th, 1940, and then, according to her testimony, only at his earnest solicitations and because he threatened to set fire to the house and commit suicide unless she came back.

Sometime in 1940 her husband began to work on war work, and his earnings were substantially increased, and he said that up until May, 1942, he "had to give her $45 a week to have peace." She was to pay the taxes; but she didn't do it, so that he gave her only $20 a week and paid the taxes himself and went to work and finished the house.

She admitted that, in self-defense, she threw things at him and called him opprobious names; that she had told him she never would have married him "if he would want to drink,"

so if he couldn't quit drinking now, he should leave her. She was asked on cross-examination: *"Q.* It was either you or the liquor?" She replied, "That's right."

She testified that she ran out of the house to the neighbors on a number of occasions to protect herself and children from her husband and returned to the house when he was asleep. She was asked "Why did you go?" and answered, "To have peace." "In other words, you wouldn't tolerate your husband while he was drunk? *A.* I didn't want to be annoyed."

Her cross-examination shows that the main reasons the wife left her husband were financial and personal dislike caused by his drinking rather than any fear she had of him. She said he wasn't "stingy," that he gave her enough money to keep house, but that he insisted that whatever was left over he was going to put in the bank. She told him that under those terms she wasn't going to live with him. She was then asked (quoting from her diary under date of May, 1942):

*"Q.* Now, later on, Monday, May 6th, you write as follows: 'I told him I would stay if he would give me $10.00 more a week, so I could save something too and to get something for myself and the house. I gave him until Monday morning. If he insisted on his plans, I would go to court.' Is that correct? *A.* Yes."

Shortly thereafter she moved out permanently.

It may well be that the husband's drinking was in part responsible for the wife's change in attitude toward him.

We may question the wisdom of the husband's exercising his legal right, under the circumstances, to indulge in the use of intoxicating liquors, but we are inclined to agree with the advisory master, who said in his conclusions: "The mere fact that a man is reasonably fond of drink is not sufficient legal reason for his wife to leave him. I do not think she was ever in fear of her husband. She has merely outgrown and become tired of him." The attitude of the wife toward her husband subsequent to her finally leaving him on December 21st, 1942, demonstrates that she is not the gentle, fragile, submissive and unoffending type of woman, referred to in *Bonardi* v. *Bonardi, 113 N. J. Eq. 25,* whose health might be

impaired by a slight abuse of the person, accompanied by opprobious language, but she is rather the vigorous, aggressive and strong-willed wife to whom such conduct would not be extreme cruelty. *Casey* v. *Casey, 83 N. J. Eq. 603.* For example, she came back to and broke into the house on numerous occasions and removed various articles which she wanted and which belonged to the husband, such as an electric mixer, electric refrigerator, electric stove, &c. He says she broke into the house through the doors and windows more than twice a month and removed almost everything. On each occasion she left a sarcastic note or slurring doggeral composed by herself. Four days prior to filing her petition for divorce she again broke into the house and took his pay envelopes and left an insulting note ending with: "I don't think I'll visit you again. I wouldn't need no more. Your wife. I hope not for long."

She was asked: "So when you went to the house and kept breaking in, you knew, of course, that it was disturbing your husband?" She replied: "That didn't worry me. It was my house." "Q. It's in your name and your husband's? A. Correct."

She said, on cross-examination, that her love for her husband was gone and had been for a long time. He said he had always been willing for her to come back and had asked her to return and tried to have the children intercede with the wife to that end, but "she just refused to return."

The husband's witnesses, Molish and Barbour, were neighbors and friends of the wife as well as of the husband and were, as their testimony indicated, disinterested. Both were subpœnaed. Both had visited the Grewe home many times and lived at a short distance away. Neither had ever heard any screams or any complaints from the wife that her husband had ever ill-treated her. Both said frankly that the husband drank and occasionally became intoxicated but that when in that condition he was not abusive or vicious. They never heard him berate or saw him threaten or strike his wife. Molish said he had heard them argue, but the wife usually started the argument and the husband "calmed her down." He recited an incident which occurred on one occasion when

he was visiting the Grewe home to look at a heating boiler, which Mr. Grewe had installed in the cellar. Mrs. Grewe suddenly opened the door and threw a pot of water over her husband and came back with a second pot which he took away from her. Barbour had been many places with the Grewes and said that the last trip he took with them was in an automobile to see a friend of Mr. Grewe's, who lived near Clinton. Mr. and Mrs. Grewe got along fine until she learned that the friend had treated her husband to two or three glasses of wine, and then she got "mad" and the trouble began. All the way home, although Mr. Grewe was not intoxicated, Mrs. Grewe upbraided him, called him "a drunken sop," and said that he couldn't take his family out a day without drinking. Mr. Grewe said nothing. Both witnesses said they had never noticed that Mrs. Grewe had any fear of her husband. It would not seem likely that a wife who was in fear of her husband would have acted in such an aggressive and belligerent manner toward him as is indicated by the proofs in this case. Our belief is that whatever happened was for the most part provoked by the wife. In any event, it is not made to appear that any of the episodes were serious in their consequences to the wife, either physically or mentally. There is no medical testimony to indicate that the wife suffered ill health by reason of any cruelty of the husband or that her life or health was endangered or was such as to require her to separate from her husband. There appears no reason to apprehend that she is in any danger in the future and nothing to suggest that she would not be reasonably safe in health and person if she continued the marital relation.

A wife cannot desert her husband because he drinks, swears, or makes her life uncomfortable. These are not crimes, but the infirmities and defects which in consideration of law, a wife undertakes to put up with when she takes her husband "for better or worse." Incompatibility of temper has not yet been made a ground for divorce by the law of this state. *Julian* v. *Julian, 127 N. J. Eq. 77.*

We think the case falls far short of the "extreme cruelty," contemplated by the act *R. S. 2:50–3c,* and the decisions of this court construing said act.

We have carefully examined the proofs and the law submitted by counsel for the wife (the husband's counsel made no oral argument and submitted no brief) and have reached the conclusion that the advisory master was warranted in his findings of the essential facts and correct in his application of the law to the facts so found.

The decree dismissing the wife's petition is, therefore, affirmed.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, COLIE, OLIPHANT, WELLS, RAFFERTY, DILL, FREUND, MCGEEHAN, JJ. 13.

*For reversal*—None.