20 N.J. Super. 565 (1952)
90 A.2d 531
ANNE MATTHEWS GERMAIN, PLAINTIFF,
v.
RAYMOND JOSEPH GERMAIN, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided July 10, 1952.
*566 Messrs. Gebhardt & Kiefer (Mr. Philip R. Gebhardt appearing), attorneys for plaintiff.
EWART, J.S.C.
By a complaint filed November 19, 1951 plaintiff seeks a divorce from her husband, the defendant, because of his extreme cruelty extending for a period beginning in 1946 until April 1, 1951.
Defendant did not answer or enter an appearance and proofs were taken ex parte on June 12, June 26 and June 27, 1952.
The proofs satisfactorily establish that the parties hereto were married on January 11, 1941; that they have both resided continually in the State of New Jersey since that date, the plaintiff presently residing at High Bridge, N.J. and the defendant at Clinton, N.J.; that two children were born of the marriage, viz. Dominick Eugene, now ten years of age, and Raymond Anthony, four years of age, both of whom are in the custody of the plaintiff; that at the plaintiff's insistence the defendant left their home at High Bridge, N.J. on April 1, 1951, since which time they have not resided together or cohabited; and that the defendant has been and now is supporting his children by voluntary payments of $200 per month to the plaintiff, their mother.
And it further appears by the proofs that the defendant is a practicing physician, formerly practicing at High Bridge and now at Clinton, N.J., and that plaintiff is a registered *567 nurse; that they together established in June of 1947 a nursing home at or near High Bridge, distant about three miles from the home occupied by them and their children, and they together operated the nursing home until their separation on April 1, 1951. The home has a 21-bed capacity and the plaintiff, a registered nurse, has always been and still is in charge of the nursing home and works there regularly, in addition to taking care of her home and her children.
At the hearing on June 12, 1952 plaintiff testified that trouble between her and her husband first arose in 1946 when she accused him of using cocaine, which he denied, and they quarreled about it; again in 1947 and 1948 they quarrelled frequently over financial matters; sometime during that period (date not stated) he called her names, including a son of a bitch and used the expression "God damn you"; that on one occasion he pushed her against the kitchen sink and that on another occasion he raised his arm as if to strike her, but she called his attention to the presence of their son and he refrained from striking her. She testified that he never actually beat her and offered her no threat of physical violence except as mentioned above. She said that he first started using cocaine, afterwards started using demerol tablets, then demerol by needle, and afterwards morphine; that the drugs caused him to be exhilarated and the demerol made him sleep; that when using drugs he became moody and would fly into a temper on slight provocation which resulted in arguments between them; and further, that he spanked their elder boy more often than was necessary. Plaintiff further testified that the defendant would on occasion fall asleep while under the sedation of drugs and would drop burning cigarettes which resulted in holes being burned in the rugs, in the sheets, and in the mattress at their home. Also that after taking drugs he would at times become nauseated, would vomit, and she would have to clean up after him. Plaintiff testified that she was afraid of her husband; that she was under a constant strain and became very high-strung *568 and nervous; that she couldn't sleep well for a year or so before their separation; that her weight went down to 98 pounds but since the separation has increased back to 112 pounds; that prior to April 1, 1951 things were getting much worse; that the defendant slept most of the time, didn't take care of his medical practice, and lay around the home, slept, and watched television. That as a result of the conditions mentioned her life with her husband was "horrible"; that his conduct upset her; that she had a sort of breakdown and had to call in Dr. Henry Danzig sometime in April 1951 after her husband had departed.
Plaintiff testified that by reason of the foregoing she requested or demanded that the defendant leave the house and that he did depart on April 1, 1951, since which date he has not resided with her nor have they cohabited. Indeed, she testified that they had not cohabited for some months prior to his departure on the date mentioned. She also testified to having had pneumonia about a year before her husband's departure on April 1, 1951, at which time she was in the hospital but that she had not consulted a doctor from that time until April of 1951, after her husband's departure, when she called in Dr. Danzig.
Thomas E. Matthews, father of the plaintiff, testified that he had resided with the parties for approximately five years; that the defendant left the home on April 1, 1951 and has not since resided there; by his testimony he verified the plaintiff's statement as to residence; he testified to having heard arguments between the parties to this suit and having heard the defendant curse the plaintiff and call her a son of a bitch; and that the plaintiff became very nervous and upset and lost considerable weight, but that since her husband's departure on April 1, 1951 she has improved and looks and acts better at this time. This witness by his testimony also verified the fact that the defendant dropped lighted cigarettes which resulted in holes being burned in the rugs and sheets in the home. And also that on some trip with the defendant to a convention, when they took a *569 shower bath together, he observed needle marks on the defendant indicating the use of some drug by needle.
Dr. Henry Danzig testified that he had known the parties for three or four years and was socially friendly with them; that during April of 1951 he examined and treated the plaintiff whom he found suffering from nervous exhaustion; that she had lost weight; she complained of insomnia, was extremely nervous, and generally was well under par.
At the second hearing in this matter on June 26, plaintiff was recalled and testified that the nursing home which she and her husband had established in 1947 was heavily encumbered by mortgages and loans, in a total amount exceeding $50,000; that she and the defendant had violent arguments over money matters; that he gambled, incurred debts, and spent money extravagantly; that after he began using narcotics his fits of temper became more violent; that she was in fear of her life because of his use of narcotics and was also afraid for her children; that defendant was unnecessarily harsh toward the elder boy Eugene; that on one occasion in 1949 he grabbed the younger boy, Raymond, and bit him on the buttocks; that the boy was badly frightened and that marks of the defendant's teeth were left on the boy and that the bite was sufficiently hard to cause the marks to become black and blue; that on another occasion in the latter part of 1949 or early 1950 he hit the younger boy, Raymond, on the top of the boy's head with defendant's open hand sufficiently hard to stun the boy and frighten him, although no real injury resulted.
Plaintiff further testified that her height is 5' 2" and during her residence with the defendant her weight went down to 98 or 100 pounds, whereas the defendant's height is 5' 10" and his weight ranges between 200 and 240 pounds.
Plaintiff further testified that she was afraid of the defendant and by reason thereof tried to avoid being alone with him and asked her parents, who slept across the hall on the same floor, to leave their door open and that she left her bedroom door open and that eventually (date not stated) she *570 left the bed of the defendant and went and slept with her son, Eugene, because she was afraid of the defendant. Plaintiff also testified that she had to check after the defendant constantly because she was afraid of fire that might occur by reason of his habit of dropping burning cigarettes; also that on long automobile trips she was afraid to ride with the defendant in his automobile because he would sometimes go into a kind of stupor; that on one occasion in the early summer of 1950 while they were riding home from Buffalo, defendant was driving their car and the car started to swerve off to the side of the road when she screamed in fear and he stopped the car, after which she herself drove the car because she was afraid to ride with him while he was driving.
The plaintiff testified that she was mentally and physically exhausted and worn out and that that condition was not entirely due to her work at the nursing home. She testified that many times she tried to persuade her husband to give up the use of narcotics; that he sometimes promised to do so, but never actually did, and that she also had mutual friends talk with him about the subject with no beneficial result.
At the second hearing plaintiff's father, Thomas E. Matthews, testified that the plaintiff had requested him to leave his bedroom door open at night because she was afraid of the defendant; that he saw the defendant strike the younger child on the top of his head with his open hand as mentioned above; and that he was also present when the defendant bit the child on the buttocks and left teeth marks on the child's body. Also that plaintiff had left her husband's bed and started sleeping with her son, Eugene, about a month before the defendant left the home on April 1, 1951.
Mrs. Helen L. Smith testified that she is a registered nurse; has been acquainted with the parties to this suit since 1938; that she has been employed in the plaintiff's nursing home for the past three years as the person next in charge after the plaintiff; that she saw the parties to this suit nearly every day while she was so employed; that she has *571 seen blankets, spreads and sheets at the plaintiff's home with large holes burned in them; that the defendant was addicted to the use of narcotics and that he had secured drugs from her on a few occasions, telling her that he wanted them for his patients; that from October 1949 to April 1951 plaintiff was in a state of physical and mental exhaustion; that plaintiff lost weight and her poor condition was very obvious; and that on the occasion when the plaintiff suffered from pneumonia the plaintiff stayed four or five weeks in the nursing home. Also that since April 1951 the plaintiff has improved somewhat and has gained weight; this witness further testified that in the spring of 1951 and the winter preceding the defendant had obtained drugs from her on four different occasions, morphine on one occasion and demerol the other three times; that she never saw him use the drugs; doesn't know of her own knowledge what use he made of them; that he was practicing medicine at the time and said he wanted the morphine for a patient suffering from extreme headache. The witness further testified that the plaintiff worked an eight-hour shift in the nursing home; was in charge of the nursing home and kept the books and accounts; and in addition that the plaintiff attended to her own home and took care of her children. Also that the defendant's arms showed multiple marks caused by the use of a hypodermic needle.
Dr. Danzig was recalled at the hearing on June 27 and emphasized and enlarged somewhat the testimony he gave at the first hearing; he stated that when he was called in to attend the plaintiff in April 1951 she was in a debilitated state; showed evidence of nervous exhaustion and mental disintegration; that from the history she gave him he found she had been under terrific mental strain because of her marital difficulties; that she was in a weakened physical condition and had lost weight; and that, after her husband's departure on April 1, 1951 she improved. He further testified that she developed pneumonia due to her debilitated condition, that is, in April 1951, and that she was extremely *572 ill; he also testified that the history obtained indicated that she had suffered from pneumonia the previous year and had almost died at that time. He attributed her condition in April of 1951 largely to her state of extreme tenseness and anxiety; to the terrific strain she was under due to her marital difficulties; and expressed the opinion that had she continued to live with her husband the effects upon her would have been catastrophic. He further testified that in his opinion the condition in which he found her in April of 1951 was not due to her work at the nursing home. Also that since her husband's departure in April of 1951 her condition had been greatly improved.
Does the foregoing state of facts, for substantially all of which there was adequate corroboration, make out a case of extreme cruelty under our statute entitling the plaintiff to a divorce? I think the question must be answered in the negative.
The only act of physical violence directed against her and complained of by the plaintiff was the one occasion when the defendant pushed her against the kitchen sink, but there was no proof as to the violence of the push or that the plaintiff suffered any injurious consequences therefrom. The only threat of violence to the plaintiff shown by the proofs was the one occasion when the defendant raised his hand as if to strike her but when she called his attention to the presence of their son, he desisted.
Punishment meted out by the defendant to his children, if excessive or unnecessarily frequent, as claimed by the plaintiff, does not make out a case of extreme cruelty under our statute entitling the plaintiff to a divorce. If the defendant abused his children, which has not been proven to my satisfaction, the law provides a remedy for such misconduct, but the remedy is not to grant a divorce to his wife.
It is, of course, true that personal violence or physical abuse is not the only form of extreme cruelty which might entitle a wife to a divorce from her husband, although most of the reported cases involve elements of physical abuse. *573 Cursing a wife, the application of vile epithets to her, unjust and malicious accusations of infidelity without sufficient cause or justification for such accusations, neglect, indifference, the use of language publicly belittling the wife, and subjecting the wife to indignities destructive of her natural pride and self-respect, taken together or some of them in combination, may well spell out a case of extreme cruelty that would endanger the life or health of the wife, or that would render her life one of such extreme discomfort or wretchedness as to incapacitate her to discharge the duties of a wife. Bonardi v. Bonardi, 113 N.J. Eq. 25 (E. & A. 1933); Zehrer v. Zehrer, 5 N.J. 53 (1950).
On the other hand, as said by Judge Wells in Grewe v. Grewe, 138 N.J. Eq. 296, at 301 (E. & A. 1946):
"A wife cannot desert her husband because he drinks, swears, or makes her life uncomfortable. These are not crimes, but the infirmities and defects which in consideration of law a wife undertakes to put up with when she takes her husband `for better or worse.' Incompatibility of temper has not yet been made a ground for divorce by the law of this state. Julian v. Julian, 127 N.J. Eq. 77."
The plaintiff testifies her life with the defendant was "horrible." That is a statement of a conclusion and not a statement of fact.
She says that he became addicted to the use of drugs including cocaine, demerol and towards the end morphine; that the use of some of the drugs caused him to get into a state of exhilaration and the use of other drugs were sedative in effect and caused him to get in a stupor and go to sleep; and that at times the use of drugs nauseated him and caused him to vomit, leaving a mess which she had to clean up. However, the proofs do not reveal how excessive might have been his use of drugs nor the number of times he vomited leaving a mess for her to clean up. But it does appear that while residing with the plaintiff he carried on a medical practice at High Bridge, N.J. and since their separation on April 1, 1951 has carried on a medical practice at *574 Clinton, N.J., which facts at least show that his alleged use of drugs was not so excessive as to make him unable to carry on his practice of medicine.
It has been said that drunkenness alone, although habitual, does not constitute extreme cruelty per se, but is a part of the "for better or for worse" of matrimony. 2 Herr (2d ed.), sec. 767, page 166, and cases there cited. There is no proof in this case that defendant was a habitual drunkard or that he drank to excess. The law with respect to drunkenness is cited because there would seem to be some analogy between drunkenness and the use of drugs, both of which, used to excess, would affect the senses and conduct of the one using them. And the same rule appears to apply with respect to the use of drugs as with respect to excessive use of intoxicating liquors. In 17 Am. Jur., page 180, sec. 58, it is stated:
"Mere drunkenness or the intemperate and habitual use of drugs on the part of one spouse is not such cruelty as entitles the other to a divorce on the ground of cruelty."
The defendant's habit of dropping lighted cigarettes which resulted in holes being burned in the rugs, sheets, and mattress, was no doubt annoying and could, under certain circumstances, endanger the safety of the inhabitants of the house. However, I know of no case where such objectionable conduct is said to constitute extreme cruelty entitling the other spouse to a divorce.
And the same thing may be said respecting the plaintiff's testimony that her husband, the defendant, sat around the house watching television, and sleeping, and neglecting his medical practice. Such conduct was no doubt annoying and could easily give rise to dissension and quarrels between the husband and wife, but does not spell out a case of extreme cruelty under our statute.
It appeared by the proofs that the plaintiff is a registered nurse and the defendant a practicing physician; that in the year 1947 they jointly established a nursing home having a *575 capacity of 21 beds; that they jointly operated it until the defendant separated himself from the plaintiff on April 1, 1951 at the insistence of the plaintiff, since which time the plaintiff has carried on; that the nursing home venture was heavily encumbered with mortgages and debts in a sum exceeding $50,000; that the plaintiff from the inception of the nursing home was in charge of its operation, kept the books and attended the business end of the transaction, and in addition to the foregoing also managed her home and attended to her two young children. She no doubt was heavily burdened with her duties at the nursing home and with her household duties and the care of her children. In contrast to that, plaintiff testified that the defendant not only neglected his medical practice, sat around the house looking at television, etc., but that he also gambled, spent extravagantly, and incurred debts, all of which resulted in violent arguments over money matters between the parties to this action.
Approximately a year before the separation on April 1, 1951, plaintiff suffered an attack of pneumonia and was confined at that time to the nursing home for a period of four or five weeks and, according to Dr. Danzig, she almost died at that time.
Dr. Henry Danzig was called in to examine and treat the plaintiff in the month of April 1951, sometime subsequent to the date on which the husband departed on April 1, 1951. He testified that he had known the parties socially for some three or four years prior to that time. He said that at that time he found the plaintiff suffering from nervous exhaustion; loss of weight; that she complained of insomnia; was extremely nervous; and was generally well under par. And upon his second appearance upon the stand at a later date, he enlarged somewhat upon the testimony given on the first occasion and said that he found the plaintiff in a debilitated state showing evidence of nervous exhaustion and mental disintegration; that from the history she gave him of her marital difficulties he found she had been under terrific *576 mental strain; that she was in a weakened physical condition; that she developed pneumonia due to her debilitated condition and was extremely ill and he attributed the condition in which he found her in April of 1951 to the terrific strain she was under due to her marital difficulties and expressed the opinion that had she continued to reside with her husband the effect upon her would have been "catastrophic." It may be significant in this connection, however, that according to the plaintiff's testimony she did not have any medical attention by a physician after recovering from the attack of pneumonia in 1950 until after she had ordered her husband, the defendant, out of their home on April 1, 1951, after which she called in Dr. Danzig, with whom she was socially friendly, and at a time when she was no doubt contemplating the institution of a suit for divorce.
The strain to which the plaintiff was no doubt subjected in managing the nursing home; her duties there as a nurse as well as business manager; her household duties in taking care of her home and two children; her worry over the heavy financial obligations encumbering the nursing home; and the failure of her husband to exhibit the ambition and diligence in taking care of his medical practice that she thought he should, as well as his practice of gambling, spending extravagantly, and incurring debts, no doubt contributed materially to the rundown and debilitated condition in which Dr. Danzig found her following the departure of her husband in April of 1951.
As has been said, it is difficult to define with accuracy the exact meaning of the term "extreme cruelty" as used in the statute. MacArthur v. MacArthur, 135 N.J. Eq. 215, 219 (E. & A. 1944). I have no doubt the plaintiff suffered extreme annoyance and exasperation at the conduct of her husband, the defendant, about which she complains. However, I cannot find under the proofs in this case that the defendant has been guilty of such acts or course of conduct as to endanger the life or health of his wife, the plaintiff, or such as to render her life one of extreme wretchedness and *577 discomfort that would incapacitate her from discharging her wifely duties.
In accordance with the views above expressed, I find that the plaintiff has not established that the defendant has been guilty of extreme cruelty entitling the plaintiff to a divorce and that judgment accordingly will go against the plaintiff, dismissing her suit. Counsel should present a form of judgment in accordance with the foregoing decision.