50 N.J. Super. 178 (1958)
141 A.2d 545
HILDA STOLOV, PLAINTIFF-APPELLANT,
v.
HAROLD L. STOLOV, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1958.
Decided May 16, 1958.
*179 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Harold J. Sklarew argued the cause for appellant.
PER CURIAM.
Plaintiff wife appeals from a Chancery Division judgment dismissing without prejudice her complaint for divorce on the ground of extreme cruelty. The husband did not contest the action and does not respond to plaintiff's appeal.
The parties were married in 1943 and are childless. They separated on March 26, 1957 when defendant left the marital residence. The complaint sets out at length a course of conduct by defendant, beginning with their honeymoon and *180 continuing to the date of separation, and alleged to have seriously affected plaintiff's health, making necessary her resort to psychiatric clinics, voluntary commitment to a mental institution on two occasions, and private psychiatric care. However, plaintiff's testimony was limited to defendant's conduct in the years immediately before the separation because, as counsel asserts in his brief and as the colloquy at the close of the testimony reveals, the trial court restricted counsel at the very outset of the trial to educing proofs of alleged cruelty covering only a "reasonable period of time" immediately preceding the separation.
Plaintiff testified, with regard to the period of about two years before separation, that defendant beat her, abused her verbally, used profane language, forbade her to eat and would not let her go out to see anyone. He accused her of being stupid, incompetent, and not worthy of him; he said she should not be allowed to live, and constantly threatened to call the police and have her committed to a state mental institution. She would try to get away from him and not answer, but this incensed him all the more and he would beat her. If she tried to get out of the house he would tear off her clothes and throw her back into the apartment. His conduct was such that she "just about gave up wanting to live," and she several times attempted suicide. She sought psychiatric help, but defendant would undo any good the doctor had done by questioning her for hours after each visit, ridiculing her and telling her she was no good. Plaintiff had visited six doctors within the last eight years, and was presently under the care of Dr. Robert Alsofrom.
Plaintiff said that after attempting suicide in 1954 by taking an overdose of sleeping pills, she voluntarily committed herself to Marlboro State Hospital, where she stayed about four months. On his visits to the institution defendant would tell her she was "a noose around his neck," that he was taking dancing lessons to improve his social life and spending weekends at expensive resorts. He said he "would see I stayed there, and if I did get out he would *181 see this business about going to the doctors was going to stop." She testified, incidentally, that she paid for her hospital and doctor bills and for all her personal needs throughout the marriage, except for two or three minor items, out of monies earned as a teacher.
Upon her return home from Marlboro she was not allowed to see anyone, go any place, or even go to the doctor. Being "locked up in the house like that" made her lose hope and she again had herself committed to Marlboro. She described her stay there as a "complete nightmare" because of defendant's actions. He would spend the 40 minutes of his weekly visit abusing her; he would give her $2 a week spending money and then demand a penny-by-penny accounting, threatening to inform the hospital authorities and have her privileges taken away from her. He would tell her of the good times he was having.
When she returned home from Marlboro the second time she found living with defendant no better, although this time she went back to work and received treatments. She started seeing her present psychologist, Dr. Alsofrom, in March 1956. The separation occurred a year later, on March 26, 1957. By that time, she said, things had gotten so bad, defendant's abuse was so constant, that she realized she would go insane and so decided to separate from him. The immediate precipitating cause of the separation was a quarrel during the course of which defendant abused and beat her. She became hysterical and phoned Dr. Alsofrom, telling him that her husband was going to call the rescue squad and have her taken to Marlboro. Apparently as a result of what the doctor said  exactly what happened is not at all clear  it was defendant who packed and left. Plaintiff had lost 57 pounds since getting out of Marlboro. She has regained 20 pounds since the separation.
Plaintiff's mother corroborated, in some respects, this account of defendant's extended course of "mean" treatment, and with specific reference to the March 26, 1957 incident testified that defendant had said he was through and wouldn't live with plaintiff any more.
*182 Dr. Alsofrom, a professional psychologist, testified that when plaintiff came to him in March 1956 she was in an "extremely serious neurotic state"; she was phobic in that she was afraid to travel, afraid to be alone, and would suffer "severe panics" in the course of which she would entertain thoughts of suicide. There were several attempts at self-destruction. In the doctor's words, plaintiff was almost completely immobilized by her emotional state. After several months' treatment he began to discern a certain pattern to her emotional reactions  she was not always depressed or phobic; there would be "flashes" of normality and self-control, but "after certain types of experiences with her husband" there would be severe reactions. To get at the root of the matter Dr. Alsofrom invited defendant to come to his office on several occasions. As a result of these interviews he felt that defendant was "a rather malevolent and sadistic personality." Defendant confidently predicted that his wife would return to a mental hospital, that her going to the doctor was useless, and he was not prepared to cooperate in any way in helping her. He said he had put as much effort into helping her as he cared to, and would now just sit back and let things take their course. Although the doctor explained that he could help plaintiff if he got defendant's cooperation, the husband's attitude did not change. Dr. Alsofrom found that defendant took a kind of enjoyment in quarreling with his wife; he would bait her and use his knowledge of her nervousness and anxiety to trap her into contradictions. The doctor was of the opinion, after a year of "moderately successful" work with plaintiff, that the relationship between the couple was essentially a very unhealthy one; that defendant was damaging plaintiff's mental health "to a point where I was merely repairing yesterday's damage or the damage of the quarrels that occurred previously; that I was making no further progress." His conclusion was that if the relationship were prolonged it would inevitably lead either to a successful suicide attempt on plaintiff's part or her return to a mental hospital.
*183 The doctor further testified that plaintiff had registered a very considerable improvement since the separation: she was actively employed, could travel for fairly considerable distances, was willing to be alone, and could adequately manage her affairs and her finances. She had assumed a great many responsibilities which she at one time felt incapable of undertaking. The situation had changed positively to a very large degree; although not entirely free of emotional disturbance, plaintiff was much happier. Dr. Alsofrom concluded that if she obtained a divorce and was completely free of her husband, she would be a reasonably well adjusted person with no prospect of returning to her former state of serious mental illness.
The general principles governing an extreme cruelty divorce action were comprehensively restated by this court in Friedman v. Friedman, 37 N.J. Super. 52, 58 (App. Div. 1955), certification denied 20 N.J. 135 (1955):
"Our courts have recognized the risk of inaccuracy involved in attempting to define extreme cruelty. See Smith v. Smith, 40 N.J. Eq. 566, 593 (E. & A. 1885). Generally, extreme cruelty has been defined as that degree of cruelty, either actually inflicted or reasonably inferred, which endangers the life or health of the aggrieved party, or renders his or her life one of such extreme discomfort and wretchedness as to incapacitate him or her, physically or mentally, from discharging the marital duties. Zehrer v. Zehrer, supra [5 N.J. 53]; Egnozzi v. Egnozzi, 17 N.J. Super. 433 (App. Div. 1952); MacArthur v. MacArthur, 135 N.J. Eq. 215 (E. & A. 1944); 11 N.J. Practice (Herr, Marriage, Divorce and Separation) (1950), sec. 755, p. 138 et seq. It has been said that the courts interfere mainly to prevent future harm rather than to punish the offender for what has already been done. Bonardi v. Bonardi, 113 N.J. Eq. 25 (E. & A. 1933); Fallon v. Fallon, 111 N.J. Eq. 512 (E. & A. 1932). No rigid rule can be laid down to define the extent of injury, actual or apprehended, which will move the court to grant a divorce. Each case must necessarily depend on its own particular circumstances. Yorn v. Yorn, 138 N.J. Eq. 608 (E. & A. 1946). It is now established that personal violence or physical abuse is not the only form of extreme cruelty which will warrant the awarding of a divorce. Germain v. Germain, 20 N.J. Super. 565 (Ch. Div. 1952); Zehrer v. Zehrer, 5 N.J. 53, 58 (1950); cf. Gross v. Gross, 22 N.J. Super. 407 (App. Div. 1952); Dominik v. Dominik, 7 N.J. 198 (1951).
*184 As succinctly stated by Herr, op. cit., sec. 755, p. 141:
"The inquiry to be made in each case in order to ascertain whether there has been extreme cruelty seems to be three-fold: (1) what were the acts and conduct of the defendant (2) what purpose, actual or imputed, motivated the defendant (3) what effect did the acts have, or will they have if continued, upon the health and life of the plaintiff?'"
See, also, Morrone v. Morrone, 44 N.J. Super. 305 (App. Div. 1957).
The trial judge dismissed the complaint without prejudice for two reasons: (1) he concluded that plaintiff had failed to establish a causal relationship between defendant's conduct and her condition, and (2) plaintiff had failed to prove that she had been obliged to separate herself from defendant because of his extreme cruelty but, instead, had established that he had left her. He was in error on both grounds.
If the proofs offered on behalf of plaintiff are fully credited, the pattern of defendant's conduct would meet the standards that have emerged in our more recent extreme cruelty cases, among which may be counted our own determinations in Friedman and Morrone, above, and also MacArthur v. MacArthur, 135 N.J. Eq. 215 (E. & A. 1944); Zehrer v. Zehrer, 5 N.J. 53 (1950); Germain v. Germain, 20 N.J. Super. 565 (Ch. Div. 1952). His treatment of plaintiff had the character, purpose, and effect which point to a case of extreme cruelty. Whether defendant's conduct, pursued over the years, itself brought about plaintiff's mental and psychological state, or whether it worsened a condition she already had at the time of marriage or that had naturally developed in the course of the marriage, is of no consequence.
We are persuaded, from as much of the marital history as plaintiff was permitted to relate, that her account of defendant's conduct carries the stamp of extreme cruelty. However, we do not have the complete story. During the colloquy at the close of the testimony the trial judge remarked that he was sure plaintiff's condition had existed *185 for a long period of time, and he had heard no testimony which would indicate that the proximate cause of her condition was defendant's conduct. Plaintiff's counsel should have been allowed to offer a fuller exposition of the entire course of the marital relation from its very beginning  as he was prepared to do when the trial began  so that plaintiff's condition, defendant's conduct, and the treatment she received in institutions and from her own doctors, could have been chronologically and comprehensively developed, thus affording a solid foundation for determining whether plaintiff had indeed established her cause of action.
Cases like this, even where tried ex parte, cannot be determined in the relatively short time required by those involving physical abuse  beatings and the like. We deal here with a more intangible situation  one where the court must consider mental states and personality patterns. A just determination requires that there be a fuller exposition of the facts.
We do not agree with the trial court's conclusion that plaintiff was not entitled to judgment simply because it was defendant who had walked out of the marital home, and not she. This was not a divorce action grounded in desertion or constructive desertion, or one for separate maintenance. We know of no requirement in an extreme cruelty case that the plaintiff wife must have left the husband. It is not difficult to imagine of circumstances where the husband unquestionably had been guilty of extreme cruelty, and upon committing the last act of the series realized that he had wrought his purpose  indeed, in a certain type of case he might have suddenly been overcome by a sense of guilt  and left the marital home. As long as a husband's behavior, the purpose which motivated him, whether actual or imputed, and the deleterious effect it had (or would have, if continued) upon the wife's health and life are sufficiently established, it makes no sense to require that the wife be the one to pull up marital stakes and leave. Here the parties both realized that living together in the same household was impossible. *186 Plaintiff apparently came to that realization first, and her doctor fully supported her.
It is to be conceded that the fact that defendant rather than plaintiff left the marital home may, under some circumstances, tend to negate extreme cruelty as indicating that defendant's conduct was not so extreme as to compel plaintiff to leave. But the remarks of the trial judge in this case do not indicate that he was regarding the facts mentioned in that light.
It could be that the conclusion of the trial judge was based, in whole or part, upon his denial of credibility to plaintiff and her witnesses. There was an undesirable generality in her recital of defendant's conduct. Many of her statements were mere conclusions, not supported circumstantially. The testimony in an extreme cruelty case should relate to specific occurrences on specific dates, sequentially presented, and plaintiff should avoid a general recitation of what defendant "would" do. If, however, the trial judge in the present case deemed plaintiff's proofs not worthy of credence, that fact should have been stated on the record along with the reasons, so that we might give proper evaluation as required by the rules to the trial judge's opportunity to judge of the credibility of the witnesses by their demeanor and manner of testifying.
Reversed and remanded, with direction that plaintiff may amend her complaint in whatever respect deemed necessary to conform to the proofs she intends to present, and with the further direction that on the rehearing testimony be taken covering the entire period of the marriage, together with such expert testimony as may be required to support her case. The trial judge should on the rehearing state his findings of fact and conclusions of law for the enlightenment of this court should there be another appeal.